BLANCHE CHAWKLEY v. WABASH RAILWAY COMPANY and SOPER J. TAUL, Administrator of Estate of W. H. LONG, Appellants.—297 S. W. 20.

Court en Banc, June 27, 1927.

**1. NEGLIGENCE: Care Commensurate with Situation: Engine Running Backwards: Humanitarian Rule.** The fact that the engine is moving backward at the country crossing, so that the engineer and fireman are obliged to look back through the cab and over the tender in order to observe an automobile approaching the railroad track at the crossing, requires them to be more alert than if they were driving forward and in normal positions, since ordinary care involves diligence commensurate with the situation. And where the moving of an engine backwards towards the crossing places the engineer on the side away from the automobile approaching the crossing, and only the fireman is in a position to see it, upon the fireman's diligence in observing the danger and in announcing it to the engineer, and upon the engineer's promptness of action to stop the engine, depends the question, under the humanitarian rule, whether sufficient diligence is observed by them to avoid injury to the occupants of the automobile.

**2. ———: Automobile Approaching Railroad Crossing: Duty to Sound Whistle: Humanitarian Rule.** Although there is ample evidence to show that the driver and the other occupants of the automobile were oblivious of their peril and unaware of the on-coming train when they were at a distance of one hundred to two hundred feet from the track, and that the fireman knew that fact and immediately, when the engine was two hundred feet from the crossing, told the engineer to stop, and that the engineer did not act upon the information, and although it may be conceded that, at the speed at which the train was running, the engineer could not have stopped the train, or appreciably slackened its speed, and that the fireman's suggestion to the engineer was useless except to warn him of the danger, still it being inferable from the evidence that a sudden blast from the whistle would have been heard, heeded and acted upon by the driver of the automobile in ample time to have avoided the collision, the only remaining question in the case, under the humanitarian rule, is whether the engineer's failure to sound the whistle was, under the circumstances, a failure to exercise ordinary care and diligence.

**3. ———: ———: Excuse for Failure to Sound Whistle: Automatic Action.** The fireman when the engine was two hundred feet from the crossing having observed the automobile from one hundred to two hundred feet from the track and approaching it and that its occupants were oblivious to danger and unaware of the on-coming train, and knowing that the train at the speed it was running could not be stopped before reaching the crossing, his reason for not telling the engineer to whistle, namely, that the engine had whistled for the crossing further back, is absurd. A warning which the occupants of the automobile had not heeded, and apparently had not noticed or even heard, was all the more reason for sounding another warning; and men in charge of railway trains are trained to quick observation and quick action, they do not have to stop to think, but automatic and instantaneous action follows the impression of danger ahead.

**4. ――――: ――――: Failure to Sound Whistle: Space of Nine Seconds.** It is not a violent inference that the fireman of a railway train could have said "Whistle" and that the engineer could have pulled the cord within the space of a single second or less. And there being evidence that the fireman saw two hundred feet from the crossing that the train was not going to stop, and that the automobile traveling half as fast was approaching the crossing, its occupants oblivious to danger and apparently unaware of the on-coming train, and that nine seconds intervened before the collision in which the fireman could have told the engineer of the danger, a case is made for the jury, under the humanitarian rule, on the question whether the fireman and engineer exercised ordinary care in failing to put into execution a warning blast of the whistle.

**5. ――――: ――――: ――――: Duty of Engineer and Fireman.** It cannot be ruled that, because the fireman had no control of the engine and the engineer could not see the automobile approaching the crossing, there was no negligence. It is not the law that where the fireman sees occupants of an automobile in a position of peril, his duties do not require him to use any effort to prevent the engine from injuring and killing them. A railway company owes to the traveling public, on approaching a public crossing, to exercise care to discover danger and prevent injury to them; and where the fireman stood up to look for danger to any one ahead of the engine moving backwards, and saw an automobile approaching the crossing, its occupants apparently oblivious to danger and unaware of the on-coming train, and told the engineer to stop, he thereby recognized his duty to use care to prevent hurting them; and if the evidence shows that, after the engineer was thus told to stop, ample time intervened before the collision for the engineer to have sounded the whistle, and it is inferable from the evidence that a blast from the whistle would have been heard, heeded and the collision avoided, the company owed to the occupants of the automobile the duty to give such warning.

**6. TRIAL: Fainting of Plaintiff: Discharge of Jury.** The general rule is that the trial court is in the best position to observe emotional outbursts of a party or witness, and to determine whether the discharge of the jury is justified. The plaintiff, suing for damages for the killing by the railroad of her husband and two minor children and injuries to herself, fainted while her counsel was making his opening statement, and was carried from the court room, and defendant's motion to discharge the jury was overruled. At the close of her direct examination she again fainted, was carried by her attorneys to the jury room where she could be heard moaning and crying, and defendant again moved to discharge the jury. Nothing in the incident indicates that her fainting was purposely accomplished. Physicians testified that she had been subject to hysteria and fainting spells since her injury and the death of her husband and children. Having fainted at the close of her direct examination, defendant was deprived of cross-examination, and her counsel thereupon offered to bring her back for cross-examination, or to allow her to be examined in the absence of the jury, her examination reduced to writing and read to the jury, but the offers were declined, and there was no motion to strike out her testimony. The same facts testified to by her were testified by other witnesses, in every particular, and defendant does not complain of the effect of her testimony, but does complain of the effect of her fainting spells upon the minds of the jury. Held, that the trial court did not abuse its discretion in overruling the motion to discharge the jury.

**7. NEGLIGENT KILLING OF MINOR: Survival of Father: Suit by Mother.** The father having died a few hours after his injury, the mother may maintain a suit for the negligent killing of their minor children in the accident. The statute (Sec. 4217, R. S. 1919) says that if the deceased be an unmarried minor the suit may be maintained by the father and mother,

and "if either of them be dead, then by the survivor," and that means the survivor at the time the suit is brought.

**8. EVIDENCE: Photograph.** Assigned error in the admission of a photograph in evidence cannot be considered if the photograph does not appear in the record.

**9. ————: Not Quoted.** If appellant fails to quote evidence objected to and to point out the place in the record where it may be found, an assignment of error in its admission cannot be considered.

**10. ————: Res Gestae: Spontaneous Admission.** A statement which arises out of the litigated act, undesigned and spontaneous, is res gestae. The testimony of an occupant of the automobile struck by the train that while she was still in the automobile the fireman came to her and asked "if I was hurt; I said, 'Aint it awful?, and he says, 'Yes, but it is our fault,'" was admissible in evidence as **res gestae**, the statement of the fireman being spontaneous and undesigned, and not a narration or explanation, and made immediately after the collision.

**11. ————: Admission: By One Party: Excluded as to Others.** A statement by the fireman, who is a defendant, that the collision "was our fault," is admissible as an admission on his part, and being admissible against one party it cannot be excluded as incompetent as to other defendants, but can be restricted in its application by the instructions.

**12. ————: Agent: Narration of Past Events.** To bind the principal, admissions and declarations of an agent must have been made during the continuation of the agency, and be contemporaneous with and illustrative of the character of the act to which they relate. The statements of the fireman of the train which collided with the automobile, at the coroner's inquest into the accident and the cause of the deaths of the occupants of the automobile, being a mere narration of previous events, after the occurrence, and not made during the continuance of the act to which they relate, are admissible in the damage suit against the fireman, as admissions, but are not admissible against the defendant railroad company by which he was employed.

**13. NEGLIGENCE: Primary: Automobile Driver: Contributory.** The driver of an automobile, who, without stopping or looking, entered upon railroad tracks whose crossing sign was visible for three hundred feet and who was in plain view of the track when he was within thirty feet of it, is guilty of such contributory negligence as bars the right of his wife to recover damages for his death on account of the failure of the company to give the required statutory signals, although the view of the train was obscured by high corn and weeds, and the automobile was old and rattled so as to prevent hearing the approaching train; for those things required him, in the exercise of ordinary care, to put his car under control, so that he could have stopped it at a safe distance from the track at a point from which he could have seen the approaching train.

**14. ————: ————: And Contributory: Wife of Automobile Driver: Seeing.** The negligence of the driver of an automobile is not imputable to his wife riding in the car with him in her action to recover damages for her personal injuries; but where her own evidence shows that, after the automobile got within the right-of-way fence and within fifty-five feet of the track and the approaching train was two hundred feet from the crossing, and after the automobile got within thirty feet of the tracks and could have been stopped in twelve feet, she failed to look or see the approaching train, she was guilty of such contributory negligence as bars her right to recover for the company's primary negligence, not for her failure to stop the automobile, but for her failure to look and see the approaching train and to impart to her husband, the driver, what she would have seen had she looked.

Neither can she recover for primary negligence on the theory that she could not see the approaching train, while the fireman saw the occupants of the automobile and could have caused the engineer to sound the whistle in ample time before the collision for the warning to have been heard, and heeded, and the collision avoided; for, under the circumstances, in the position in which the automobile was, if the fireman could have seen its occupants she could have seen the train.

15. ———: Instructions: Duty of Fireman to Stop Train. Instructions submitting the hypothesis that the fireman could have stopped the train by the exercise of ordinary care in time to have prevented its collision with an automobile, should not be given, where there is no evidence that he had any power to stop it, and the only precaution he could have taken was, having discovered the peril of the automobile, to cause the engineer to sound the whistle.

16. ———: Primary and Contributory: Recovery by Parent for Death of Child. A parent whose negligence has contributed to the death of her child cannot recover, under the penal statute, as for the primary negligence of the defendant, on account of the child's death. The penalty is not compensation, but punishment to the defendant who negligently caused the child's death, and the parent whose negligence contributed to cause the child's death cannot claim the penalty, in an action based on defendant's primary negligence.

17. ———: Evidence: Other Afflictions. A physician should not be permitted to testify that the plaintiff, suing for injuries received when an automobile collided with defendant's train, is afflicted with prolapsus of the womb and lacerations from childbirth, unless such afflictions are shown to be due to such injuries and come within the pleadings.

18. ———: ———: Pleading Injuries: General and Specific: Evidence. The test of the admissibility of evidence pertaining to physical conditions is not only that they follow naturally the injuries complained of, but that they necessarily do so. Allegations that plaintiff's "nerves and nervous system were shocked, injured and permanently impaired and made diseased, and her memory, mental faculties and powers of concentration and thought and speech permanently affected and impaired" and that she was "seriously and permanently injured, wounded, bruised and made diseased, both externally and internally," are general, and not specific, and do not necessarily include insanity, epilepsy or prolapsus of the womb, and evidence of such afflictions is not admissible under such general allegations.

19. ———: Mental Distress: Evidence Based on Hypothetical Question: Instruction. There can be no recovery for mental distress and mental afflictions unless they are caused directly by the physical injury; and it is error to get before the jury by hypothetical questions propounded to an expert evidence that plaintiff's epilepsy, hysteria and fainting spells were caused directly by the violent death of her husband and two children, and particularly so where it is not specifically alleged that she was afflicted with such mental troubles; and the injurious effect of such evidence is not cured by an instruction authorizing a recovery only for mental suffering caused directly by plaintiff's physical injuries.

20. ———: ———: Gruesome Situation: Irrelevant Evidence. In an action to recover damages for personal injuries evidence to show the gruesome situation following the collision of the railroad engine with the automobile in which plaintiff was riding, such as the mangled condition of her children and husband, is not competent on the issue of mental distress.

21. ———: Gruesome Situation: Statutory Penalty: Aggravating Circumstance. In an action by a wife to recover the statutory penalty for the negligent killing of her husband, and in an action by a mother to recover the

317 Mo. Sup.—50.

statutory penalty for the negligent killing of her minor child, the violent and sudden death of the husband in the one case, and the sudden and violent death of the child in the other, is an aggravating circumstance under the statute (Sec. 4217, R. S. 1919), and evidence thereof is admissible, if negligence was the cause of death.

**22. NEGLIGENCE: Gruesome Situation: Mangled Form of Guest.** All evidence pertaining to the mangled form of a guest riding in the automobile at the time of its collision with the railroad train, such as that his skull and brains were scattered over the track, is irrelevant to any issue (a) in an action by plaintiff for personal injuries received in the accident, and (b) in an action by a wife to recover the statutory penalty for the negligent killing of her husband, and (c) in an action by the mother to recover the statutory penalty for the negligent killing of her minor child, growing out of such collision.

**23. EXCESSIVE VERDICT: Irrelevant Evidence.** Where it is apparent the verdict was augmented by irrelevant and otherwise incompetent evidence, and because of its admission and other errors the cause must be remanded for a new trial, the court will not go over the evidence relating to plaintiff's specific injuries, nor undertake to decide that the verdict was or was not excessive.

**24. EVIDENCE: Mere Opinion: Incompetency of Engineer.** In an action for negligence, testimony of a witness at work at a sand car near the point of collision between the railway train and the automobile, as to what he would do or could do if he were in charge of an engine under similar circumstances, is mere opinion and wholly incompetent.

**25. ———: Negligence: Incompetency of Engineer: Unpleaded.** Plaintiff cannot show the age and enfeebled condition of the engineer of the train which collided with the automobile where the incompetency of the railway employees in charge of the train is not alleged as a ground of negligence.

**26. GENERAL ASSIGNMENT: Civil Case.** A general assignment of error in the motion for a new trial preserves for review evidence improperly admitted in the trial of a civil case. It is not necessary that the motion specifically call the attention of the court to the particular evidence objected to. The Act of 1925, relating to motions for a new trial in criminal cases, does not apply to civil cases; and even if it did, it would not apply to a motion filed before the act went into effect.

**27. ARGUMENT TO JURY: Gruesome Situation: Negligence.** In an action for negligence, remarks of counsel for the plaintiff in his argument to the jury that "these people lay there dead; the corner impaneled a jury in the presence of the dead little girls, in the presence of the dead man, in the presence of the gruesome sight, the blood and brains," etc., being comment upon evidence which was wholly irrelevant, and aggravating the prejudice caused by the erroneous admission of evidence pertaining to the body of "the dead man," a guest in the automobile and whose negligent killing by defendant's railroad train is not the basis of the action, are improper and prejudicial.

**28. ———: Outside of Issues.** Argument of plaintiff's counsel to the jury which are without the issues, such as remarks concerning the age and enfeebled condition of the engineer of the train which collided with the automobile, the incompetency of the trainmen not being alleged as a ground of negligence, is improper.

Corpus Juris-Cyc. References: **Damages,** 17 C. J., Section 152, p. 831, n. 54; Section 153, p. 834, n. 69; Section 320, p. 1022, n. 31. **Death,** 17 C. J., Section 78, p. 1232, n. 42; Section 93, p. 1244, n. 63. **Evidence,** 22 C. J., Section 401, p. 348, n. 30; Section 465, p. 391, n. 90; Section 545, p. 455, n. 74; Section 602, p. 514, n. 21; 23 C. J., Section 1793, p. 50, n. 59; Section 1972, p. 151, n. 63. **Negligence,** 29 Cyc., p. 553, n. 81. **Railroads,** 33 Cyc., p. 1017, n. 73; p. 1048, n. 40; p. 1063, n. 54; p. 1129, n. 68; p. 1133, n. 1. **Trial,** 38 Cyc., p. 1296, n. 77; p. 1494, n. 80.

Appeal from Grundy Circuit Court.—*Hon. L. B. Woods*, Judge.

REVERSED AND REMANDED.

*S. J. Jones, D. F. Warren, H. L. Moore* and *Homer Hall* for appellants.

(1) The court erred in refusing the peremptory instructions requested jointly and severally by the defendants at the close of all the evidence in the case directing the jury to find and return a verdict in favor of the defendants. Under all of the evidence in the case plaintiff failed to make a case for the jury. State ex rel. Wabash Ry. Co. v. Bland, 281 S. W. 690; State ex rel. v. Bland, 237 S. W. 1018; Sullivan v. Gideon Railroad Co., 271 S. W. 983; Betz v. Railroad, 253 S. W. 1089; Frie v. Ry. Co., 241 S. W. 671; George v. Railroad, 251 S. W. 729; Beals v. Ry. Co., 256 S. W. 733; Guyer v. Railroad, 174 Mo. 350; Monroe v. Railroad, 297 Mo. 653; Boyd v. Railroad, 105 Mo. 371; Kelsy v. Railroad, 129 Mo. 374; King v. Railroad, 211 Mo. 1; Kries v. Railroad, 148 Mo. 333; Mockowik v. Railroad, 196 Mo. 570; Burge v. Railroad, 244 Mo. 76; Kelle v. Railroad, 258 Mo. 78; Rollinson v. Railroad, 252 Mo. 525. Even under the last-chance doctrine, some allowance of time must be made for the human mind to grasp the situation in an emergency and to realize the danger, and to act. Degonia v. Railroad, 224 Mo. 596; Burge v. Railroad, 244 Mo. 102; McGee v. Railroad, 214 Mo. 543; White v. Railroad, 159 Mo. App. 509. (2) The court erred in not declaring as a matter of law that there could be no recovery on the first count of the petition, for the reason that it clearly appears that if Ernest Chawkley, the driver of the automobile, had driven the same in a careful and prudent manner and exercised the highest degree of care which the law enjoined upon him the collision would not have occurred and hence in no event under the evidence in the record could there be a recovery for his death. Laws 1921 (Ex. Sess.) 91, sec. 19; Monroe v. Railroad, 297 Mo. 633, 653; Threadgill v. United Railways Co., 279 Mo. 467; Jackson v. Bell Tel. Co., 281 Mo. 358. (3) The court erred in refusing and denying defendants' motions to discharge the jury and continue the cause because of the fact that plaintiff twice fainted in the court room in the presence of the jury during the trial and each time had to be carried from the court room in the view and presence of the jury. Gurley v. St. Louis Transit Co., 259 S. W. 895; Stutz v. Milligan, 223 S. W. 128; Ullom v. Griffith, 263 S. W. 876; Franklin v. Kansas City, 260 S. W. 503; Savings Bank v. Denker, 275 Mo. 607; Wray v. State, 154 Ala. 36, 16 Am. & Eng. Ann. Cases, 364. (4) The plaintiff had no right to maintain the action under the second and third counts of the peti-

tion for the death of the minor children of plaintiff and Ernest Chawkley, for the reason that the father of said children survived them and whatever right of action, if any, was created by the death of said children passed to the plaintiff and Ernest Chawkley in equal shares, and upon the death of said Ernest Chawkley, after the death of said minors, the right of action, if any, for the death of said minors passed to and vested in the estate of Ernest Chawkley and the plaintiff in equal shares, and plaintiff had no right to maintain this action in her own name alone for said deaths. State ex rel. Thomas v. Daues, 283 S. W. 51; Betz v. Ry. Co., 284 S. W. 455; Bates v. Sylvester, 205 Mo. 493. (5) The court erred in permitting Mrs. Jenkins, a witness for plaintiff, to testify, over defendants' objections, that defendant Long came to her after the accident while she was in the automobile and asked if she was hurt and said, "It is our fault." The question as to whose fault it was, was the very issue that was being tried by the jury and was for the jury to determine. It was prejudicial to both defendants and particularly to the Wabash Company. (6) The testimony of the plaintiff's medical witnesses in response to hypothetical questions was erroneous. These questions were based upon assumptions not proved and upon plaintiff's physical condition shown to be the result of childbirth. They called for and elicited mere conclusions and speculation, and based one inference upon another, and invaded the province of the jury to determine the vital and essential facts. Jackmann v. Railroad, 187 S. W. 786; Castanie v. Railroad, 249 Mo. 192, 194; Roscoe v. Met. Street Ry. Co., 202 Mo. 576; Glasgow v. Railroad, 191 Mo. 347, 359; Mahany v. Kansas City Rys. Co., 286 Mo. 601. (7) The court erred in overruling defendants' objection to the testimony of Dr. Hass as to what he might attribute the displacement of the womb to and as to whether plaintiff's actions indicated to him a mental derangement, for the reason (a) the question assumed the accident caused the displacement; (b) that there was no evidence to show that the accident had caused any such condition or that it had not existed before the accident; (c) the witness testified that the birth of plaintiff's eight children had caused the condition; (d) because there was no relation between this condition and the death of plaintiff's husband and children, which reference was wholly immaterial and prejudicial, and (e) because the question called for a mere conclusion, guess and speculation by asking what you might attribute the cause of the displacement to. Cardinal v. Kemp, 300 Mo. 241, 274; Perkins v. Wilcox, 294 Mo. 700, 242 S. W. 978; Castanie v. United Rys., 249 Mo. 192; Magill v. Boatmen's Bank, 288 Mo. 489, 232 S. W. 448. (8) The court erred in overruling defendants' objections to the testimony of the medical witnesses for plaintiff to the effect that she was mentally deranged and crazy, had epilepsy, and might die as the result thereof, and in overruling

defendant's verified motion to continue the case because testimony of such conditions were outside the scope of the petition and defendants were not prepared to meet that issue. Hall v. Coal & Coke Co., 260 Mo. 351, 372; Hibbler v. Rys. Co., 292 Mo. 14, 237 S. W. 1017; Walquist v. Rys. Co., 292 Mo. 34, 237 S. W. 495; Connor v. Rys. Co., 298 Mo. 19, 250 S. W. 576. (9) The defendants were not liable for the mental condition of the plaintiff, and the court erred in admitting evidence of her mental condition and of the possible permanent duration of it and of the effects that might result from it. The defendants could not be liable for the mental condition of the plaintiff unless it was shown by the evidence to have been the direct and proximate result of the negligence of the defendants and directly connected with bodily injury received by the plaintiff as the result of such negligence. Braun v. Craven, 175 Ill. 405; Indianapolis & St. Louis Railroad Co. v. Stables, 62 Ill. 313; Keyes v. Railway Co., 36 Minn. 290; Scheffer v. Railroad Co., 105 U. S. 249; Haile v. Ry. Co., 60 Fed. 557, 9 C. C. A. 134; Derry v. Fletner, 118 Mass. 131; Hoag v. Railroad Co., 85 Pa. St. 293; C. St. P. M. & O. Railroad Co. v. Elliott, 55 Fed. 950. The defendants are not liable for any mental suffering or derangement resulting from shock or grief produced by the death of plaintiff's husband and children. The admission of testimony of this kind and of the supposed future effect upon plaintiff was erroneous. Perkins v. Wilcox, 294 Mo. 700, 242 S. W. 974; Trigg v. Railroad, 74 Mo. 153; Connell v. Telegraph Co., 116 Mo. 34; McCardle v. Dry Goods Co., 271 Mo. 111. (10) The court erred in admitting the testimony of the witness Waters that if he had been in the engine he would have attempted to warn the persons in the automobile. This testimony invaded the province of the jury and set the judgment and conclusions of the witness as the test by which the action of the engineer and fireman was to be weighed and the liability of the defendants determined. Indianhoma Refining Co. v. Fire Ins. Co., 242 S. W. 712; Unrein v. Hide Co., 295 Mo. 353, 244 S. W. 928; Heberling v. Warrensburg, 133 Mo. App. 547; King v. Mo. Pac. Ry. Co., 98 Mo. 235; Bowman v. Coal & Mining Co., 168 Mo. App. 708; Eubank v. City of Edina, 88 Mo. 650; Disbrow v. Storage & Fuel Co., 170 Mo. App. 585. (11) The evidence shows that the plaintiff was guilty of negligence which directly contributed to her injury and for that reason she is not entitled to recover on the ground of failure to give the statutory signals, and the court erred in refusing to give defendants' instruction, withdrawing that issue from the jury and directing a verdict for defendants on that issue. Henderson v. Railroad, 284 S. W. 794; Authorities cited under point 1.

*Ed. M. Harber, A. G. Knight, Gerald Cross* and *Pross T. Cross* for defendant.

(1) Plaintiff made a case under each count of the petition, and the peremptory instructions requested were properly denied. The evidence in the case clearly showed that plaintiff was entitled to have her cause, on each count, submitted to the jury under the humanitarian doctrine. The evidence established her right to recover on account of a violation of the statute requiring the giving of the bell or whistle signal. However negligent the occupants of the automobile may have been, defendants will be liable under the humanitarian doctrine, if the fireman either saw, or by the use of ordinary care could have seen, the automobile approaching the crossing without checking its speed and apparently unmindful of the approach of the train, in time to have prevented the collision by either giving a warning, or stopping or checking the speed of the train. Allen v. Railway, 281 S. W. 737; Zumwalt v. Railway, 266 S. W. 717; Logan v. Railroad, 254 S. W. 705; State ex rel. Wabash v. Trimble, 260 S. W. 1000; Chapman v. Railway, 269 S. W. 688; Koontz v. Railroad, 253 S. W. 413; Conley v. Railroad, 253 S. W. 426; Tavis v. Bush, 280 Mo. 383, 217 S. W. 274; Stewart v. Railway, 188 S. W. 198; Ellis v. Railway, 234 Mo. 630; Hinzeman v. Railway, 199 Mo. 56; Wolf v. Railway, 251 S. W. 441; Murrell v. Railway, 279 Mo. 92, 213 S. W. 964; Maginnis v. Railway, 268 Mo. 667, 187 S. W. 1165; Eckhard v. Railway, 190 Mo. 593. (a) The danger zone is not the track itself, as defendant contends, but it extends to whatever distance from the track the enginemen can ascertain that the traveler is oblivious to the approach of the train, or is apparently intending to cross the track. And enginemen have no right to wait until the traveler places himself in a dangerous situation, but they should act as soon as the appearance of the traveler gives indication that he does not intend to stop. Stewart v. Railway, 188 S. W. 198; Ellis v. Railroad, 234 Mo. 656; Holden v. Railway, 177 Mo. 456; Bunyan v. Railway, 127 Mo. 12; Barrie v. Railway, 119 Mo. App. 38; Moore v. Railway, 194 Mo. 11; Cytron v. Railway, 205 Mo. 720; Echard v. Railway, 190 Mo. 693; Murray v. Railway, 108 Mo. App. 510; Murrell v. Railway, 279 Mo. 92; Maginnis v. Railway, 268 Mo. 667; Wolf v. Railway, 251 S. W. 441; State ex rel. Wabash v. Trimble, 260 S. W. 1000; Logan v. Railway, 254 S. W. 705; Zumwalt v. Railway, 266 S. W. 725; Tavis v. Bush, 280 Mo. 383. (b) It is as much the duty of those operating an engine to warn the traveler, by timely and proper signals, when in the exercise of ordinary care they can do so, as it is their duty to stop or check speed. And although a train cannot be stopped or the speed checked in time, after the discovery of the traveler's peril, to avoid injury thereby, yet the defendant will be liable if the injury could have been prevented by use of a warning

signal. Logan v. Railway, 300 Mo. 611; State ex rel. Wabash v. Trimble, 260 S. W. 1000; Ross v. Davies, 228 S. W. 508; Wolf v. Railway, 251 S. W. 441; Rollison v. Railroad, 252 Mo. 538; Tavis v. Bush, 280 Mo. 383, 217 S. W. 274; Murrell v. Railroad, 279 Mo. 111, 213 S. W. 964; Eppstein v. Railroad, 197 Mo. 720; Maginnis v. Railroad, 268 Mo. 678, 187 S. W. 1165; Preston v. Railroad, 292 Mo. 453, 239 S. W. 1080; Dutcher v. Railroad, 241 Mo. 137; Hill v. Railways, 289 Mo. 204, 233 S. W. 205. (c) Enginemen should be so skilled in the management and operation of their engines, that when confronted by sudden peril and by emergency, they should be able to readily perceive and cope with such situations. And in any event, where the peril and emergency is caused by the negligence of the enginemen themselves, as is so palpably the case here, they cannot be heard to justify themselves and excuse themselves by an emergency which they themselves caused. Hall v. Ry., 240 S. W. 175; Zumwalt v. Railway, 266 S. W. 725; Moore v. Railway, 283 S. W. 732. (d) It is also a well established law that if the inability to give signal, or to stop or check speed, arises from some prior negligent act of defendant, then such inability is no defense, and defendant will be held liable. Mason v. Railway, 246 S. W. 318; Sullivan v. Railway, 117 Mo. 214; Goben v. Railway, 226 S. W. 631; Ruenzi v. Payne, 231 S. W. 294; Murrell v. Railway, 105 Mo. App. 88. (e) In cases involving the humanitarian doctrine, the courts exact speedy action, and will predicate a liability on even a second of time. Griggs v. Railway, 228 S. W. 508; Strutman v. Railway, 238 S. W. 817; Ross v. Davis, 248 S. W. 611; Wolf v. Railway, 251 S. W. 441; Moore v. Railway, 283 S. W. 732; Zumwalt v. Railway, 266 S. W. 725; Allen v. Railway, 281 S. W. 737. (f) The failure to either ring the bell continuously within eighty rods of the crossing, or to sound the whistle at intervals until it was passed, rendered defendants guilty of negligence *per se;* and the law presumes that such negligence was a proximate cause of the collision, and the burden is cast on defendant to overcome this presumption. Sec. 9943, R. S. 1919; Persinger v. Railway, 82 Mo. 196; Crumpley v. Railroad, 98 Mo. 34; Kenney v. Railway, 105 Mo. 270; Lamb v. Railway, 147 Mo. 171; Green v. Railway, 192 Mo. 131; Stotler v. Railway, 200 Mo. 107; McNulty v. Railway, 203 Mo. 475; McGee v. Railway, 214 Mo. 530; Monroe v. Railway, 280 Mo. 483, 219 S. W. 68; Midgett v. Railway, 124 Mo. App. 540; Day v. Railway, 132 Mo. App. 707; Byars v. Railway, 161 Mo. App. 692; Brown v. Railway, 166 Mo. App. 255; Welch v. Railway, 190 Mo. App. 213; Lloyd v. Railroad, 128 Mo. 595; Allen v. Railway, 281 S. W. 737. (g) A recovery was only sought on the first count under the humanitarian theory, and, however negligent Chawkley may have been, yet the defendant would still be liable for his death, if they did, or could have by use of ordinary care, seen the automobile in or going into a

position of danger, in time to have prevented the collision, either by giving a warning, stopping the train or checking its speed. Authorities above cited. (2) The fainting and sobbing of plaintiff during the trial was a physical misfortune, over which she had no control; and the trial judge, in whose presence it occurred, was in a position to better judge of its effect on the jury, and the granting or refusing the motion to discharge the jury, was a matter peculiarly within his discretion; and the appellate court will defer to the action of the trial court on that question. Ullom v. Griffith, 263 S. W. 876; State v. Chick, 221 S. W. 10; Stutz v. Milligan, 223 S. W. 128; Bulware v. Mfg. Co., 152 Mo. App. 567; Cope v. Ins. Co., 191 Mo. App. 435; McCarty v. Transit Co., 192 Mo. 396; Franklin v. Kansas City, 260 S. W. 502. (3) The cause of action for the death of a minor child vests in the father and mother, or to the survivor of them at the time of judgment. It is personal right, and does not go to their estate. Senn v. Railway, 124 Mo. 621; Sec. 4217, R. S. 1919. (4) Appellant contends that the trial court erred in the admission of testimony. But this assignment of error cannot be reviewed in this court for the reason that appellant did not call the attention of the trial court to any of these assignments of errors in its motion for a new trial. When error is charged in the admission or rejection of evidence, the trial court is entitled to have the evidence complained of specifically pointed out and called to his attention in the motion for a new trial. And if this is not done, the alleged errors cannot be reviewed on appeal. Sec. 1267, R. S. 1919; Bartner v. Darst, 285 S. W. 499; State v. Knight, 278 S. W. 1039; Sec. 1454, R. S. 1919. (5) Plaintiff can recover for shock, fright and mental impairment. Where there is a physical injury, the injured person can recover for shock, nervous and mental, and for fright, terror, mental impairment and any other disease of body or mind which the jury may find to be a direct and proximate result of the defendant's wrongful act. 17 C. J. 838, 843; McArdle v. Dry Goods Co., 271 Mo. 111, 191 Mo. App. 263; Lowe v. Railway, 145 Mo. App. 248; Heiberger v. Tel. Co., 133 Mo. App. 452; Weissman v. Wells, 267 S. W. 400; Mollman v. Light Co., 227 S. W. 264; Porter v. Railroad, 73 N. J. L. 405; Conley v. Drug Co., 218 Mass. 238; Shay v. Railway, 66 N. J. L. 334. (6) The doctrine of "imputed negligence" has long since been uprooted and rejected in this State, and it is the well settled law that the negligence of the husband is not to be imputed to the wife, nor is the negligence of the father to be imputed to his minor children. Even if his negligence was a contributing cause of such death, still his negligent act would not bind or bar the mother. She is in no wise accountable or responsible for his negligent acts, and she is the sole plaintiff in this action. If she were guilty of negligence, it might present a different situation. But she is not. And any act of negligence on his part cannot extinguish

her right under the law to recover for the deaths of her two babies. (7) Statement of defendant Long was admissible: At the time of the collision the automobile was carried on the front of the engine until the engine came to a stop, and the witness, Mrs. Jenkins, remained in the car. The engine was brought to a stop in about 500 feet from the time of the collision, and just as soon as it stopped the fireman ran to Mrs. Jenkins, she being only about twenty-five feet from him. As soon as he reached her she said: "Oh, isn't this terrible?" and Long replied: "Yes, but it is our fault." This evidence was entirely competent for two reasons. First, because it was an admission made by a party to the suit against his interest, Long being a party defendant; second, it was a part of the *res gestae*, the statement having been made within a few seconds of the happening of the main event. Friedman v. Railways, 293 Mo. 235, 238 S. W. 1074; Adáir v. Railroad, 282 Mo. 133; Mitchell v. Violette, 221 S. W. 777; Vest v. Kresge, 213 S. W. 165; Luzzadder v. Call, 198 S. W. 1144; Lareau v. Lareau, 208 S. W. 241; Atkinson v. Osteopathy, 202 S. W. 452, 1912 C, Ann. Cas. 307, 318; Giles v. Mo. Pac. Railroad, 169 Mo. App. 35. The statement made by plaintiff, within two minutes of the injury, and while still under the car, that "if they had not stopped so soon, this would not have happened," held *res gestae.* Wilson v. Railway, 13 Utah, 52, 44 Pac. 1040, 57 Am. St. 766; Pryor v. Payne, 263 S. W. 982; State v. Galbreath, 267 S. W. 880. (8) As to injuries to plaintiff's mental condition, the allegations were abundant to admit evidence of mental condition, epilepsy, etc. No complaint was made thereof as required in motion for new trial. Secs. 1267, 1454, R. S. 1919; State v. Ackerman, 285 S. W. 739. (9) The testimony of the expert witnesses was proper, and the cases which defendant cites in support of its contention, have been expressly overruled. O'Learly v. Steel Co., 260 S. W. 55; Kinchlow v. Railway, 264 S. W. 416.

WHITE, J.—The plaintiff brought this suit to recover damages on account of the death of her husband and two children, and injuries to herself, which occurred in Clay County when the automobile in which they all were riding was struck by an engine drawing a train of the defendant Wabash Railway Company. The suit was filed in the Circuit Court of Davies County, against the defendant Railway Company, Christopher Smith, engineer, in charge of the engine, and Herbert Long, fireman. Afterwards, the death of Engineer Smith was suggested, and the suit dismissed as to him. The defendant then filed application to remove the cause to the Federal court, which application was overruled. The case was transferred on change of venue to Grundy County, where a trial was had, verdict returned, and judgment rendered June 30, 1924.

The petition is in four counts: The first asks $10,000 damage on account of the death of plaintiff's husband; the second, $10,000 on account of the death of plaintiff's daughter, Margaret Chawkley, four years of age; the third, $10,000 on account of the death of plaintiff's daughter, Blanche Chawkley, six years of age; and the fourth, $50,000 for plaintiff's injuries. The verdict awarded her $10,000 on the first count, $5,000 on the second count, $5,000 on the third count, and $30,000 on the fourth count.

While the appeal was pending at the April term, 1926, of this court, the death of the defendant Long was suggested; Soper J. Taul, his administrator, entered appearance, and action was revived against him.

Ernest Chawkley, with his family, lived in Kansas City, Kansas. On September 4, 1923, he, with his wife and two children, Blanche and Margaret, drove to Clay County, Missouri, north of Excelsior Springs, to visit Mr. and Mrs. Jenkins. After a visit to the Jenkins home they drove in Chawkley's touring car to the Jenkins farm, which Chawkley contemplated renting. They drove across the defendant's railroad track at the Harris crossing, going west, and soon started on the return trip to the Jenkins home, going east, Chawkley driving the car, Jenkins sitting with him in the front seat. The plaintiff, Mrs. Chawkley, sat on the right in the rear seat, with Mrs. Jenkins on the left, and the two little girls between them. When they reached the Harris crossing a train of the defendant company came from the north and struck the automobile as it got upon the track, instantly killing the two little girls, injuring Chawkley so that he died within three hours, and injuring plaintiff.

The negligence alleged as ground for recovery was failure of the servants of the defendant company, Engineer Smith and Fireman Long, to sound the statutory warnings on approaching the crossing; and principally failure to observe the humanitarian rule and stop the train, or slacken its speed, or give warning of its approach, after the operative saw, or by the exercise of ordinary care could have seen, the plaintiff and her companions in a position of imminent peril. The case was submitted to the jury, on the first count, on the humanitarian rule, and on each of the other counts it was submitted on the humanitarian rule and the company's alleged primary negligence in failing to give the statutory signals.

I.    The first error assigned is the action of the trial court in overruling defendant's demurrer to the evidence on the ground that a case was not made out on any theory of negligence. This makes it necessary to examine the evidence bearing particularly upon the humanitarian rule.

**Sufficient Evidence: Sounding Whistle.**    The railroad track at that point, running north and south, was upon a grade which put the tops of the rails about five feet higher than the roadway at a distance of

400 feet from the crossing. The road approached the crossing in ascending grade. For about a hundred feet west of the crossing the grade rose three feet and two inches. In the last thirty feet of the approach to the crossing the grade rose 2.23 feet. The right-of-way at that point was 100 feet wide. The plaintiff introduced measurements to show that the right-of-way fence on the west was fifty-five feet and seven inches from the track; that the wrecked automobile was found 520 feet south of the centre of the crossing. But defendants' evidence tends to show that it was carried less than 500 feet when the train stopped.

The plaintiff introduced evidence to show that, as they approached the crossing, a field of high corn on the left came within a few feet of the right-of-way fence, which with weeds and bushes between the corn and the fence, obscured the view to the north so that the occupants of the car could not see the coming train.

The engine was moving backward; the train was hitched to the front, so that the engineer and fireman were obliged to look back through the cab, over the tender, in order to observe anyone approaching the railroad in front. This made it more difficult to observe persons approaching the track, and caused some delay in operating the controls so as to check the speed of the train. While this would not impose a greater degree of care upon the employees of the railroad company, ordinary care involved diligence commensurate with that situation, and required them to be more alert than if they were driving forward and were themselves in the normal positions. This circumstance placed the engineer to the right, away from the approaching automobile. Only Fireman Long, on the west side, was in position to see the approach of the automobile, and upon his diligence in observing the danger, announcing it to the engineer, and the engineer's promptness of action, would depend whether sufficient diligence was observed.

Plaintiff introduced evidence tending to show that no whistle or bell was sounded, or warning given of the train's approach. She introduced the deposition of Fireman Long, and also Long was sworn and testified as a witness for her. He was not definite in his statements about the rate of speed at which the train and automobile were going. He said in one place that the automobile was traveling at the rate of twenty miles an hour. Other witnesses testified to the same. He said also that the train was traveling about twenty-five or thirty miles an hour. In another place he said that the train was going about twice as fast as the automobile. He said he saw the automobile when it was 200 feet from the crossing. The plaintiff's counsel tried to get him to say that he had admitted it was 300 feet, but he stuck to the statement that it was about 200 feet. Then this occurred:

"Q. What did you say to the engineer *immediately* upon seeing it? A. I told him to stop.

"Q. What did you say to him, if anything, of the impending danger to those people? A. *I didn't say anything about that.*

"Q. You saw the people did not see you? A. I could not tell whether they saw us or not.

"Q. You saw they were not going to stop? A. No, sir; I didn't see that; *they didn't look like they were going to stop. . . .*

"Q. You observed that they were not going to stop as you thought, and *immediately notified the engineer?* A. Yes."

In his deposition he stated that he could not tell which way the people in the automobile were looking. While on the stand he testified that he saw the automobile 200 feet away from the crossing, and *immediately* told the engineer to stop. In answer to leading questions by plaintiff's counsel, which the court permitted, he stated that he did not say anything to the engineer until the automobile was within seventy-five feet of the track. He then told the engineer to stop. On repeated questioning he stated that was *all he said* to the engineer. He never suggested the whistle, because the engine had whistled for that crossing back at a distance which is not definitely given. He stated further that in order to sound the whistle all the engineer had to do was to give one pull on the bell cord—to reach up and take hold of the cord.

Mrs. Chawkley and Mrs. Jenkins, the only survivors of the wreck, testified that as the automobile approached the crossing some men at a sand car, to the right of the crossing, saw the approaching automobile and began to call and wave their hands, endeavoring to attract attention. They were seen by Fireman Long. One of those men, Otha Waters, was asked what he saw about the people in the automobile that caused him to think a warning was necessary when they were about a hundred or one hundred and fifty feet from the crossing. He said: "Well, they just kept coming; the automobile was running about twenty miles an hour." Several of those men testified to their attempts to attract the attention of those in the automobile to the on-coming train. One of them said they did this when the automobile was about even with the right-of-way fence, which the evidence showed was 55 feet and 7 inches from the crossing. Long put the distance of the automobile at 100 feet when the sand men made their demonstration.

The defendants produced, as witnesses, engineers who testified that the train would run about 450 feet after the engineer got the signal to stop. It ran a greater distance than that after the collision. There was also evidence tending to show that the brakes were not applied until about the moment of the collision.

The fact that the men at the sand car saw that the automobile appeared to be going on across when it was from 150 to 55 feet from

the crossing, indicates that the occupants of the automobile were not aware of the approaching train, and their danger. To the fireman himself the people "didn't look like they were going to stop," when the automobile was two hundred feet from the track. The inference most favorable to the plaintiff, which we are·obliged to draw, is that he *immediately* told the engineer to stop. That fact proves that he then thought the automobile was not going to stop. But the engineer did not act upon it, for the train ran 450 feet or more before it stopped. So there is ample evidence to show that the driver of the automobile and his companions were oblivious of their peril and unaware of the on-coming train when they were at a distance.of 100 to 200 feet from the track, *and Long knew it.*

There is some evidence as to the distance within which an automobile could be stopped: going at twenty miles an hour, within twenty or twenty-five feet; going at twelve miles an hour, within ten or fifteen feet; and in a shorter distance when going up grade. This evidence was objected to, but, as a matter of common knowledge, automobiles of all makes can be stopped within about that distance. Even if the automobile could not have been stopped in time·it could have been turned off the road, down an embankment, at much less risk than being hit by a train.

For the purpose of this argument it may be conceded that the engineer could not have stopped the train, or appreciably slackened its speed, and Long's suggestion was useless except to warn the engineer of danger. But it is reasonable to infer that a sudden·blast of the whistle when the automobile was 200, or 100, or even 50 feet or less from the track, would have been heard, heeded, and acted upon by the driver. Long's reason for not telling the engineer to whistle, that he had already done that further back, is absurd. A warning which the people in the automobile had not heeded, and apparently had not noticed or even heard, was all the more reason for sounding another warning.

There is some speculation as to how much time it would take for the fireman, after seeing the peril of the plaintiff and her companions, to call to the engineer, for the engineer to comprehend the message and to sound the whistle. It must be remembered that men in charge of railway trains are trained to quick observation and quick action. They do not have to stop and think of the thing to be done. Action follows the impression—automatic and instantaneous—otherwise, they could not hold their jobs. Appellant cites cases, State ex rel. Wabash v. Bland, 281 S. W. 690, and Sullivan v. Gideon, 271 S. W. 983.

In the Sullivan case there is considerable refinement in the quoted extracts from the Springfield Court of Appeals, regarding what might happen in a given number of seconds where it is said that four seconds is equivalent to four ticks of a watch. A careful count

shows that a watch ticks four or five times in a second. An official who watches a foot race can time it to the tenth of a second. His mind apprehends the end of the race and the winner and his action stops the watch. That is, his eye registers the thing that happens, the message is conveyed to his brain, his volition transfers the message to his hand, and the watch is stopped within the tenth of a second. A sprinter runs three hundred feet in ten seconds—thirty feet a second. If, as Long says, the train was going thirty miles an hour, and the automobile half as fast, the latter moved at twenty-two feet per second. There was evidence that the automobile was going not more than twelve miles an hour. If, when it was 200 feet from the track, Long saw it was not going to stop, nine seconds, and if it was only 100 feet, then 4½ seconds, intervened before the collision in which Long could have told the engineer of danger. It is not a violent inference that the fireman could say "Whistle!" and the engineer could pull the cord within the space of a single second or less. We do not have to indulge in refinements to reach such a conclusion because trainmen are trained to act instantaneously.

The danger zone in this case was the point where the Chawkleys were seen to be going on, unaware of the danger. It was for the jury to say whether nine seconds intervened between the apprehension of danger and the time of collision, or whether within even half that period there was time to have put into execution a warning blast of the whistle, while the car was yet at such a distance that it could have been stopped or driven off the road. We think, under the humanitarian rule, a case was made out for the plaintiff on each count.

The cases more nearly in point on the showing made here are Allen v. Railway, 281 S. W. 737, and Zumwalt v. Railway, 266 S. W. 717. In each of these the facts are similar to the facts in this case. In the Zumwalt case the very propositions discussed here are quite fully considered. This court said (l. c. 725): "Engine men are required and trained to be in such positions as not to be surprised, but to act quickly in emergencies."

Appellant argues that because Long had no control of the engine, and the engineer could not see the automobile, there was no negligence. On that theory the defendant company owed no duty, in approaching a crossing, to exercise care to discover danger and prevent injury to people on the highway. In this case Long *saw* the plaintiff and her companions in a perilous position; his duties did not require him to use any effort to prevent his engine from slaughtering them, is the effect of the argument. Long stood up to look for danger to anyone ahead. He told the engineer to stop. He thus recognized a duty upon him to use care to prevent hurting the people who were going into danger, unaware of it. That he owed them that duty as an employee of the company is too manifest for discussion. In the

Zumwalt case it was held that sounding the emergency whistle might have avoided the injury.

II.   While plaintiff's counsel was making his opening statement plaintiff fainted and was carried out.   Defendants thereupon moved to discharge the jury, and the motion was overruled.   Again, while Mrs. Chawkley was on the stand, immediately at the **Fainting:** close of her direct examination she fainted and was car- **Discharge** ried out by her attorneys.   She was taken to the jury **of Jury.** room where she could be heard moaning and crying.   The defendant again moved the court to discharge the jury because of the prejudice the incident would create in the minds of the jurors.   A number of cases are cited, but we are unable to find any which directly supports the appellants' contention.   It was, of course, the duty of the trial court to protect the jury from any improper influence.   There appears to have been nothing in the incident to indicate that this fainting was purposely accomplished.   The evidence of physicians shows that Mrs. Chawkley had been subject to hysteria and fainting spells since her injury and the death of her relatives. The general rule is that the trial court is in best position to observe such "emotional outbursts" of a witness and to determine whether a discharge of the jury is justified.   [Stutz v. Milligan, 223 S. W. 128; Ullom v. Griffith, 263 S. W. 1. c. 880.]   These and other cases are cited by appellant.   In none of them is it decided that the trial court abused his discretion either in sustaining or overruling a motion of the kind.

Plaintiff fainted at the close of her examination in chief, and appellants were deprived of cross-examination.   Her counsel thereupon offered to bring the witness back for cross-examination, which offer was declined for the stated reason that there might be another fainting spell.   Plaintiff's counsel then offered to allow the witness to be examined in the absence of the jury, her examination reduced to writing and read to the jury later.   That offer was refused.   There was no motion to strike out the plaintiff's evidence because of its injurious effect.   Appellant claims that such action would not have been an adequate remedy because the evidence was already before the jury, had made its impression and could not be erased.   As to that, the same facts testified to by the plaintiff were testified to by other witnesses, in every particular, not only as to the situation of the parties at the time of the injury, but as to her condition.   It was not the effect of her evidence that the appellant complains of, but the effect of her fainting spell.   As to the propriety of discharging the jury, we are unable to find that the discretion of the trial court was abused.   On another trial precaution should be taken to avoid a repetition of the incident.

III. Appellants contend that the plaintiff, Blanche Chawkley, had no right to maintain this action on account of the death of the children, because such right was in their father who survived them for three hours, and instead of passing to the plaintiff it passed to

**Death of Father: Suit by Mother.** the administrator of Ernest Chawkley. The statute under which this action is brought (Sec. 4217, R. S. 1919), provides that in case of the death of a person from injury, the person or corporation causing the injury, or whose employees caused the injury, may be sued: "3rd. If such deceased be a minor and unmarried . . . then by the father and mother who may join in a suit, and each shall have an equal interest in the judgment; or, if either of them be dead, then by the survivor."

That does not mean the parent surviving at the time of the injury or death. If that had been in the legislative mind, language more clearly expressive of the idea would have been used. The "survivor" may bring the suit; that is, the survivor at the time the suit is brought. This statute is practically the same as it was in the Revised Statutes of 1889, which was construed by this court in the case of Senn v. Southern Railway Company, 124 Mo. 621, contrary to the contention of appellant.

IV. Appellants assign error to the admission in evidence over their objection, Exhibit 2, a photograph of the scene of the collision, offered by the plaintiff. While this photograph is mentioned as having

**Photograph.** been introduced in evidence and the abstract of the record has a notation directing the clerk to copy, still it does not appear in the record. We cannot consider whether there was error in introducing it, because of that fact.

Appellants complain of the admission of the testimony of experiments made by witness Hall Thomas, showing the view in looking over the ground, and the testimony of witness L. M. Smith in tests

**Evidence Not Quoted.** made in stopping a train. The appellant, while carefully citing the pages of objectionable matter which he desires us to consider on other points, has neglected to quote the evidence objected to, and to point out the place in the record where it occurs.

V. Mrs. Jenkins testified that she was still in the automobile after the accident, and that Long, the fireman, came to her and this conversation ensued: "He asked if I was hurt. I said,

**Res Gestae: Admission.** 'Aint it awful,' and he says, 'Yes, but its our fault.' ". Long denied this statement.

Appellants contend that it was error to receive it because it was not *res gestae*. We have held that a statement which arises out of

a litigated act, undesigned, spontaneous, is *res gestae*. [State v. Reeves, 195 S. W. 1. c. 1030; State v. Hart, 309 Mo. 77, 274 S. W. 385; Atkinson v. Am. Sch. Osteopathy, 202 S. W. 452; Mitchell v. Violette, 221 S. W. 777; Friedman v. United Railways Company, 293 Mo. 235.] The circumstances indicate that this statement of Long was spontaneous, undesigned; it was not a narration nor an explanation. It occurred immediately after the train stopped and appeared to have been unpremeditated; uttered in the intense excitement of the moment. It was admissible as *res gestae*. This is in accordance with the ruling in Rosenweig v. Wells, 308 Mo. 617, 1. c. 630-633, where the authorities on the subject are reviewed at length. It was also admissible as an admission on the part of Long, a defendant. Where evidence is admissible against one or more of several parties to a suit, it cannot be excluded because it is incompetent as to other parties to the suit. It can be taken advantage of only by proper instruction directing the jury that it is not to be considered as to the parties against whom it is incompetent. That is true even in a criminal case. [State v. Bersch, 276 Mo. 1. c. 416, and cases cited.]

The statements of Long at the coroner's inquest were admitted in evidence. He was one of the employees in charge of the train which did the damage. The rule in relation to admissions and declarations of an agent is, that, in order to bind the principal, the admission or declaration must have been made during the continuance

**Admissions by Agent.** of the agency in regard to the transaction to which it relates. It must be contemporaneous and illustrative of its character. A merely subsequent narrative of how the matter occurred would be inadmissible. [St. Charles Savings Bank v. Denker, 205 S. W. 1. c. 210; Fisher v. Pullman Co., 212 Mo. App. 280.] The statement of Long at the coroner's inquest was a mere narration of previous events, after the occurrence, and was not made during the continuance of the act to which it relates. Therefore, while admissible against Long, it was not admissible against the Railway Company. [Redmon v. Railroad, 185 Mo. 1. c. 11, 12; State ex rel. Banker's Life Insurance Co. v. Reynolds, 277 Mo. 1. c. 24.]

VI. That Chawkley was guilty of contributory negligence, precluding recovery, on account of the failure of the Railway Company to give the statutory signals, is conceded by the respondent in submitting the first count only on the humanitarian doc-

**Driver's Negligence.** trine. As he approached the railroad crossing the sign of it was visible for three hundred feet. He knew the danger of such crossing. Respondent claims that the view of the train was obscured by corn and weeds; that the automobile was old and rattled so as to prevent hearing the approaching train. Under those circumstances it would seem that Chawkley, in the exercise

317 Mo. Sup.—51.

of ordinary care, would have put his car under control so that he could stop within a safe distance from the track at a point where he could see an approaching train. It is conceded that he was in plain view of it when within thirty feet of the track.

Was Mrs. Chawkley, the plaintiff, negligent, so as to bar her recovery on the ground of primary negligence of the Railway Company? It is true that Chawkley's negligence could not be imputed to her, but she had it within her power to warn Chawkley and prevent his going upon the track, just as the fireman had **Wife's** it within his power to warn the engineer of danger in **Negligence.** front. She saw the men at the sand car frantically waving and calling, words she could not understand, when she was about on a line with the right-of-way fence, 55 feet and 7 inches from the west rail of the track. The road approached the track on ascending grade of between two and three feet in the last thirty feet of the approach. The plaintiff's witness, Miles Monroe, testified that an automobile going at twelve miles an hour could be stopped within ten or fifteen feet, and going at twenty miles an hour could be stopped at twenty or twenty-five feet, and that going up grade it could be stopped within a shorter distance. Defendant objected to this testimony, but the plaintiff is bound by it.

She labored to prove that the fireman on the engine, who saw the automobile when it was 200 feet away from the track, and all the time from that time until it was struck, could have caused the engineer to give a blast of the whistle in time so that the automobile could have been stopped before it got upon the track. At the same time the plaintiff labored to prove that the occupants of the car could *not* see the approaching train on account of the corn and other obstructions. That is, that Long could see the automobile, but the people in the automobile could not see the engine. No doubt circumstances might be so that such a thing could happen. For instance, the corn and other obstructions could have been so high that Long could see only the top of the automobile, while his engine was entirely obscured from view. But the evidence here contradicts that situation.

Mrs. Chawkley herself testified that as they approached the crossing their view to the north was obscured by the corn, which came up near the right-of-way fence, which was 55 feet and 7 inches from the west rail of the track. She mentions no obstructions between the right-of-way fence and the track. Mrs. Jenkins testified that the corn was close to the right-of-way fence, and trees and bushes were inside the field between the corn and the fence, all of which obscured the view to the north because she could not see over them. She also said there was a dump on the right-of-way, about as high as the right-of-way fence, and weeds grew two or three feet high on top of that dump. But she nowhere says that that dump or those weeds,

either on account of their height or on account of their covering all the space, obscured the view of the train. She did not say how wide they were, nor that the train could not be seen on that account after the automobile got beyond the line of the right-of-way fence. *After that she did not look in that direction for the coming train.* Both she and Mrs. Chawkley testified that Chawkley and Jenkins looked both ways for a train; that about the time they got to the line of the right-of-way fence their attention was attracted by the outcrys and gestures of the sand-car men, and they did not turn their eyes back up the track until the automobile was too close to the track to stop.

The evidence of those two witnesses who viewed the matter from the automobile fails to show any obstruction to the view of the train from the automobile after they passed the line of the fence. The automobile on that ascending grade could have been stopped in twenty feet, at furthest. Mrs. Jenkins testified that the car was going at twelve miles an hour, or less; therefore it could have been stopped in ten feet going up grade. Not one in the car took the precaution to look up the track to see if a train were coming. It is argued that their attention was distracted by the clamors of the sand-car men, which appellant says could have been heard a half-mile. The very attempts to warn them confused them, and it is claimed, contributed to their catastrophe.

But the matter is entirely settled by the testimony of Long, the plaintiff's witness. He said in the passage quoted above from his deposition that he saw the automobile 200 feet away, and immediately told the engineer to stop. The people in the automobile "didn't look like they were going to stop."

He then went on to say that he could not tell which way the people were looking. This indicates that he formed his judgment that they were not going to stop *from the actions of the people.* He was not talking about the automobile, but about the people in it. In his testimony on the stand he said that, as he approached the crossing, standing in the cab, he could see behind the cornfield the heads of the people in the automobile, back 200 feet. He was asked:

"Q. You could see their heads then? A. Yes.

"Q. Could you tell which way they were looking? A. I said in the statement that I didn't know which way they were looking.

"Q. You looked at the people—saw their heads? A. *I saw the people in the car.*"

The plaintiff wants us to hold that the fireman of the engine could see the *people* in the car, but that *he* was out of sight to them. If the evidence for the plaintiff and defendant conflicted in this particular it would be another question, but *all* this is evidence produced by the plaintiff, who makes out a case for herself by proving that the fireman could have caused a blast of the whistle in time for the

automobile to stop before it went into danger, when 200 feet away, because he *saw* the people in the car. Since he plainly saw them they necessarily could see him at the same time so as to employ the same method of escape. The approach of the train in plain view was the same warning to the people in the car as the blast of the whistle would have been. While the plaintiff insists that Long had it within his power to cause the engineer to sound a warning, by the same reasoning Mrs. Chawkley had it within her power to call her husband's attention to the danger and induce him to stop the car before going upon the track.

In this connection it is not intended that we should give undue endorsement to the assumed function of the back-seat driver. It is not a question of controlling the movements of the car, but negligence in failing to discover danger in time to warn the man at the wheel.

We have held that the case was submissible under the humanitarian rule, and on the theory that in a second, or the fraction of one, a warning could be sounded. The same prompt action is demanded of the driver of an automobile. In a fraction of a second he can press down on the brakes and throw out the clutch. The rule must work both ways, as to the opportunity to see and the time to act upon the appearance of danger. So that the case for the personal injuries, on the fourth count, was improperly submitted on the issue of primary negligence.

VII. Instructions 3, 4 and 5, were wrong because they contained the hypothesis that Long, the fireman, could have stopped the train by the exercise of ordinary care, in time to have prevented the accident. There was no evidence whatever that the controls **Fireman.** were at his hand. They were convenient for the engineer. The precaution he could take was to *cause* the warning to be sounded or the train to be stopped.

VIII. Appellants complain of error in the giving of instructions which authorized a recovery by the plaintiff on counts 2 and 3, for the death of the children on account of primary negligence on the part of the defendant Railway Company in failing to give the statutory warnings of its approach to the crossing.

We have held above that the plaintiff is not entitled to recover for her own injuries on account of primary negligence of defendants; that she can recover, if at all, only under the humanitarian rule. The question, then, is: Can a parent, whose negligence has contributed to the death of the child, recover *under the penal statute* on account of that death except under the humanitarian rule?

So far as the children are concerned, had they survived, no negligence on the part of their parents could prevent their recovery.

Negligence is not imputed. The doctrine of imputed negligence no longer obtains. [Neff v. City of Cameron, 213 Mo. 350.]

The general rule is that when a parent brings an action in his own name for the death of an infant child, he must be denied recovery if his own negligence contributed to the accident which resulted in the child's death, provided the defendant was negligent only, and did not wantonly inflict the fatal injury. [23 A. L. R. 670 et seq.] The annotation at that point cites cases from many states in support of the rule. That is the rule in this State. [Howard v. Scarritt Estate, 267 Mo. 398, l. c. 402; Levin v. Street Ry. Co., 140 Mo. 624; Cornovski v. Transit Co., 207 Mo. 263; Reynolds v. Kinyon, 222 S. W. 476, l. c. 479; Czezewzka v. Railway Co., 121 Mo. 201.] This rule seems to obtain whether the action is one at common law or one under a statute. Of course, the common-law cause of action accruing to the parent on account of such death is a different cause of action from that which accrued to the child had it survived the injury. In the Cornovski case, supra, the court approved an instruction which denied recovery by the parents if the jury should find that their negligence contributed to the death. That was an action at common law.

In the Kinyon case, supra, an action by the parents for the death of their child, the defense was that the parents negligently permitted the child to stray unattended into the street where it was killed. It was held (at page 479) that such defense in that case was not good, because the recovery was warranted on account of the negligence of the driver in failing to prevent the casualty when by the exercise of ordinary care he could have done it. Judge SMALL, who wrote the opinion, placed it on the same basis as an action to recover under the humanitarian rule. Some of the other cases arose in the same way. Where the parent has been negligent in allowing the child to be placed in a position of danger, recovery is allowed because the driver of the vehicle which caused the death, by the exercise of proper care could have prevented it. These cases do not aid us in solution of the question here.

If the children had survived their injuries each would have had a cause of action on account of the primary negligence of defendants, not under the statute, but one at common law, with the measure of recovery incident to that action. But that cause of action died with them. The statute (Sec. 4217, R. S. 1919) *created* a cause of action which did not before exist, in favor of their parents. It was not the same cause of action as that which accrued to the children transferred to them. It was entirely different, with a different measure of damages and based upon a different principle. The children's recovery would have been entirely compensatory, with the amount limited only by the extent of the injury sustained. The recovery by the parents for the death has a maximum and minimum limit, without

regard to the amount necessary to compensate for the loss. Some light is thrown upon this problem by cases in jurisdictions where the statute permits a recovery by the administrator of the child whose death is caused by the negligence of the defendant, and where the parent contributed to that injury. In such cases negligence of the parent bars recovery to the extent of his interest in the result, but it will not defeat recovery altogether. [Phillips v. Denver City Tramway Co., 53 Colo. 458; Donk Bros. Coal & Coke Co. v. Leavitt, 109 Ill. App. 385.] The rule is the same in several other states. In some jurisdictions it is held that the negligence of one parent is the negligence of both, and prevents recovery.

In this State the statute fixes a penalty against the Railway Company for causing the death. While it is not compensation for the loss, it must be paid to the parent, the person who sustains the loss. There is no reason then why the same principle should not be applied as in a common-law action by a parent whose negligence has contributed to the death of its child. The penalty is punishment of the Railway Company for negligently causing the death. No recovery can benefit the dead children. The parent negligently contributed to that death. Without her negligence it would not have happened. She is not in position to claim the penalty for a catastrophe to which her own act contributed. Therefore, Instruction 7, submitting counts 2 and 3, on the alleged primary **negligence of defendant**, was error.

IX. While Dr. Hass was on the stand as a witness for the plaintiff he was permitted by the court, over the objection of defendants, to testify that the plaintiff, Blanche Chawkley, was af-

**Expert Testimony.** flicted with prolapsus of the womb and laceration from childbirth; that she had borne quite a number of children. Aside from the absence of any attempt to show that this was due to the injury complained of, it was not within the pleadings and was inadmissible.

The witness was further permitted to say that she was crazy, mentally unbalanced, and had fainting spells with a suggestion of epilepsy.

The petition alleges that the plaintiff's "nerves and nervous system were shocked, injured and permanently impaired and made diseased, and her memory, mental faculties and powers of concentration and thought and speech permanently affected and impaired." It also alleges that she was "seriously and permanently injured, wounded, bruised and made diseased, both externally and internally." These allegations are entirely general and not specific. There is nothing in them to suggest prolapsus. While that might *naturally* follow from shocks, bruises and internal injuries, it would not *necessarily* do so. That is the test of admissibility of an injury not specifically

pleaded. [Hibbler v. K. C. Rys. Co., 292 Mo. 23-24.] It is a specific injury and therefore should have been pleaded in order to let that evidence in. Further, the allegations of shock to the nervous system and impairment of memory and mental faculties is a general allegation of injury, and does not necessarily include insanity and epilepsy. This court in the Hibbler case considered this question at length.

All this evidence was therefore inadmissible in support of the fourth count.

Further, in examining the physician, the attorney for the plaintiff in a hypothetical question predicated it upon the fact that the defendant was normally strong and healthy before injury; that she was in the automobile accident in which she received several jolts and jars, and in which her husband was killed and her two little children killed outright, and the physician was asked, assuming these facts to be true, whether prolapsus might be caused by that. The answer was, ''Yes.'' The physician was then allowed to state the condition of plaintiff, her raving and muttering, as an indication of derangement. He said that she was insane. The court neglected to rule on an objection to that evidence, and exception is assigned to failure to rule.

A hypothetical question was propounded by plaintiff's counsel to Dr. Rooks, which hypothesized the facts concerning the injury and killing of the husband, and the two little girls, as well as the various shocks to the plaintiff. The physician was asked if the fainting spells and hysterio-epilepsy was due to the collision, and answered in the affirmative. Objection to this was overruled. All this included matters entirely outside the pleadings, and matters irrelevant.

The condition was aggravated further in the continued examination of plaintiff's counsel, where Dr. Rooks said:

''A. My judgment is presence of the existing cause of the condition was the traumatism received at the time of the accident.

''Q. Would you say, coupled with that *the violent death of husband and two children?* A. I should think that her condition is due to the whole incident.''

Objection to the question was overruled and the answer permitted. Then attorney for plaintiffs suggested in his question that there was no way to restore the dead husband, and the two children. Objection overruled. The answer was that of course the dead husband and two children could not be restored. Then followed these questions:

''Q. I will ask you to state whether or not that is one material cause, in your opinion, as a fair medical man?'' Objection overruled and the physician answered, ''Yes, sir.''

There was more of this. An endeavor constantly to get before the jury that the shock of seeing her husband fatally injured and

her two children instantly killed so affected plaintiff as to aggrevate her condition.

The rule is that mental distress, suffering, may not be recovered for unless directly caused by a physical injury. The plaintiff could not recover for impairment which the evidence showed to be in her physical and mental condition, unless that particular impairment could be traced directly to the physical shock or physical wounds or bruises inflicted upon her. Respondent attempts to escape this conclusion by calling attention to the instruction which authorized only a recovery for mental suffering caused directly by her physical injuries. But that instruction does not take away the injurious effect of this evidence which was clearly put before the jury. Respondent also calls attention to cases where a person injured was permitted to recover for injury caused by fright. As to that it is sufficient to say that there is no allegation of fright in the petition. Neither is there any evidence that the plaintiff was frightened. The injury in that respect was done when she saw her husband and dead children. It was not fright in anticipation of an injury, which was put before the jury; it was mental distress caused by a realization of the injury which had already occurred. All of this was inadmissible in support of the fourth count.

In examining Otha Waters, one of the men at the sand car, plaintiff's counsel asked him to describe the scene. The witness stated that he first came to Jenkins. Over the objection of the defendant he said Jenkins was terribly mangled, cut up, his head crushed; his face was all there, but his skull and brains were scattered over the track; he saw what they called the brain; he saw them scrape them up; he didn't see any dogs there.

The court overruled objections to all this testimony. Plaintiff's counsel said he wanted to show "the condition this woman saw—I want to get all the conditions . . . I asked the condition . . . the sight was . . ."

One of the sand car men testified that it made him nervous to see the situation there, and this was objected to. Objection overruled. The witness was permitted to say that Chawkley, as he lay there, was groaning, and he was asked if he heard Chawkley begging for someone to kill him. Witness answered he didn't hear the words.

Here was an effort, approved by the court, to show horrifying scenes there which produced the very conditions in the plaintiff of which she complains and for which she asks damages. The witness was then asked if he saw the little girls. He saw one; and was asked if she was mangled. The witness did not know about the mangling, but he found the girl under the car.

All this evidence was irrelevant so far as the fourth count is concerned. It was also incompetent as to other counts, particularly counts two and three. The statute, Section 4217, permits a recovery

for a death of not less than two thousand dollars nor more than ten thousand dollars, "in the discretion of the jury." It was held in the case of Grier v. Railway Company, 286 Mo. l. c. 533, a death case, that an instruction which told the jury, in determining the amount to be awarded, they might take into consideration the facts constituting negligence, including aggravating circumstances, if any, tending to show such negligence was proper. Under that ruling it may be said that the violent and sudden death of the little girls and the fatal wounding of the husband were aggravating circumstances, attending the negligence of the railroad company, if its negligence was the cause. But it was not proper, even in support of the death claims in the first three counts to show the gruesome nature of the situation as it affected the plaintiff's mind.

All the evidence in regard to the mangled body of Jenkins, his scattered brains and the like, was wholly irrelevant to any issue on any count. It was very prejudicial to the defendant, and should have been entirely excluded. It requires reversal of the case on all counts, even if there were no other errors.

X. It is further claimed by the appellants that the verdict on the fourth count is excessive. That the personal injury to the plaintiff was insufficient to warrant a verdict of that size. No doubt the verdict was largely augmented on account of the irrel-
**Excessive** evant and otherwise incompetent evidence mentioned
**Verdict.** above. It is not necessary for us to go over the evidence regarding these specific injuries which she incurred. On another trial the jury may be able properly to appraise any injury to her if they find for her on the fourth count.

XI. The court permitted the witness Waters in his examination for plaintiff, to testify what he would do, or could do, if he were in charge of an engine under similar circumstances, all of which was mere opinion and wholly incompetent. Nor was it
**Incompetency** proper for the plaintiff to show the age and en-
**of Engineer.** feebled condition of Engineer Smith because incompetency of the employees of the train was not alleged as a ground of negligence.

XII. The respondent contends that the objection to the evidence is not preserved in the motion for new trial because such objections are only general and do not call specifically the attention of the court to the particular evidence objected to. Appellant cites on that point the case of Bartner v. Darst, 285 S. W. 449. That
**General** case supports the position of appellant, but it is not
**Assignments.** sound law; it is contrary to the rule announced by this court in the Wampler case, 268 Mo. 486, which has been pretty

consistently followed.    It is contrary to the later ruling of this court in the case of State v. Baldwin, decided at the present term of this court, en banc, 317 Mo. 759, where Judge GRAVES, who wrote the opinion, reviews the authorities on that point at length.    It must be remembered that the Act of 1925, relating to motions for new trial in criminal cases, does not apply to civil cases.    If it did it would not apply to this case, because the trial was had on motion filed before that act went into effect.

XIII.    Some of the objections to the remarks of counsel apply to the comments upon the evidence as to disputed facts.    Those objections are not well taken.

Counsel for respondents dwelt upon certain horrifying facts with remarks such as "these people lay there dead;" "that coroner impanelled a jury in the presence of the dead little girls, in the presence of the dead man, in the presence of the gruesome sight—the blood and brains."    The objection to this was overruled.    This was a comment upon the evidence which was wholly incompetent, as shown above, and called attention to the gruesome conditions for which there could be no recovery on any account.    It aggravated the prejudice caused by the incompetent evidence relating to the body of Jenkins.    Objection to all remarks of that kind should have been sustained and plaintiff's counsel rebuked.    Likewise, the argument of plaintiff's counsel regarding the age and incompetency of the engineer was without the issues, and the objections to it should have been sustained.

The appellants complain of other errors in instructions given on behalf of plaintiff, and of error in refusing instructions offered by defendants.    The instructions are at great length; it is unnecessary to consider them in detail.    On another trial they should be framed in accordance with the law as announced in this opinion.

There are other complainants in relation to the admission and exclusion of evidence, but whatever errors may have been committed in that respect, probably would not occur on another trial.

For the reason mentioned above the judgment is reversed and the cause remanded on all counts.    All concur, except *Walker, C. J.,* who concurs in result only.