STATE OF MISSOURI at the relation of SIRKIN & NEEDLES MOVING COMPANY, a Corporation, Relator, v. JEFFERSON D. HOSTETTER ET AL., Judges of the St. Louis Court of Appeals.—101 S. W. (2d) 50.

Division Two, December 23, 1936.

212

*Allen, Moser & Marsalek, Moser, Marsalek & Dearing* and *William H. Allen* for relator.

*John F. Clancy* and *Mason & Flynn* for respondents.

COOLEY, C.—Certiorari. William B. Crane, as plaintiff, obtained judgment in the Circuit Court of the City of St. Louis against Sirkin & Needles Moving Company, a corporation, this relator, for $3750 for personal injuries and damage to his automobile due, it was claimed, to negligence of the truck driver of relator, defendant in the original action. Upon appeal by said defendant the St. Louis Court of Appeals affirmed the judgment in an opinion reported under the style of Crane v. Sirkin & Needles Moving Co., in 85 S. W. (2d) 911. By this proceeding relator seeks to have quashed said opinion and judgment of the Court of Appeals as being in conflict with certain prior decisions of this court. From respondents' opinion the facts appear substantially as follows:

Crane was injured in a collision between his automobile, which he was driving, and a truck driven by Frank Morris, relator's servant, in the intersection of Garrison Avenue, a north and south street, and Thomas Street, an east and west street, in St. Louis, each street being thirty-three feet wide. According to Crane's testimony he was driving north in the east side of Garrison Avenue, intending to go on north, and Morris was driving east in Thomas Street. As Crane approached the intersection he reduced his speed and first looked east on Thomas Street, seeing that the way was clear in that direction. On account of certain buildings he could not see to the west on Thomas Street till he neared the south line of the intersection. Then, when within six or eight feet of said south line he saw the truck 130 or 140 feet west of him, coming eastward in the south half of Thomas Street. He could not then estimate the speed of the truck.

He had reduced his own speed to six or eight miles an hour. He then accelerated his speed and proceeded northward. He said, ''When I saw the truck again it was at the northwest corner of the intersection. At that time my automobile was traveling to the center or a little past the center of Thomas Street. The truck was just coming up to the sidewalk line on the west side of Garrison Avenue. It was then running about 25 or 30 miles an hour. I stepped on my brake and came close to a standstill. I was practically on a standstill when I was hit by the truck. I had accelerated my speed to 12 or 15 miles an hour at the time I applied the brake. When I saw the truck at the northwest corner of the intersection. . . . I stepped right down on the brake pedal. The next thing that happened the truck came into collision with my automobile. After the collision my automobile was on the northeast corner of the intersection. The front wheels were on Garrison Avenue. The back of it was toward the east and the front was facing the west, just the least bit on an angle to the south. The truck was facing east. It was on the north side of the street (Thomas Street). I did not hear any horn sounded by the truck at any time. The truck was swerving to the north to the further side of the street before this accident happened.'' He said the accident occurred at about two o'clock P. M., on a clear day, and that the streets were dry; that when he applied his brakes as he was ''passing the middle of Thomas Street'' he stopped in about half a car length; that if he had kept his foot on the gas instead of ''stepping on the brakes in the middle of the street'' he thought he would have increased his speed to twenty or twenty-five miles an hour by the time he had ''finished. crossing the street.'' He further said: ''When the truck was 30 feet west of me my automobile was in the middle of the street traveling north and at about that time I stepped on the brake. From the time I saw the truck 130 to 140 feet west of me on Thomas Street I saw it almost continuously. I mean I watched it. I might have taken a quick glance to the east again, and then watched the truck coming. I saw it coming practically at all times from a distance of 130 to 140 feet away. When I got in the middle of the street I applied the brakes hard because I saw the truck was not slowing down. The truck was 30 feet away from me then, but it was coming.''

Other witnesses for Crane testified, as stated in respondents' opinion, that immediately after the collision the truck, which had stopped or had been stopped by the impact, was standing, headed east, north of the center line of Thomas Street. One witness said it was about eight feet from the north curb line of Thomas Street. Two others said, respectively, that it was ''slightly north of the center'' and ''a little north of the center'' of Thomas Street.

Morris, who testified for the defendant moving company at the

trial of the original suit, gave a quite different version of the accident. For the purpose of this review his testimony, as set out in respondents' opinion, may be briefly sketched. He said that as he approached the intersection he was driving eastward in Thomas Street, about eight feet from the south curb, at about fifteen miles per hour, at which speed he could have stopped his truck in about ten feet, his brakes being in good condition; that he did not see Crane's automobile until it was within about twenty feet of him, at which time the front wheels of his truck were "just about in the middle of the street car track which runs north and south in the middle of Garrison Avenue;" that he had then reduced his speed to about ten miles an hour; that the automobile was coming toward him at a speed he judged to be "around about thirty-five or forty miles per hour, something like that" and that "it turned like it was going to go down Thomas Street and then it cut right around in front of the truck," its left side striking the front of the truck; it "hit the front of the truck with a side-swipe." He said that when he discovered the automobile approaching he "cut to the left," applied his brakes, and stopped "right of a sudden."

After stating the facts, which we have outlined above, respondents in their opinion said:

"By an instruction given at the instance of the plaintiff the court submitted the case to the jury under the humanitarian rule, on the theory that the driver could have stopped the truck, or slackened its speed, or swerved its course, or given a timely warning, so as to have avoided the collision. Defendant assigns error for the giving of this instruction on the ground that there is no evidence that the truck could have been stopped, or a warning given, in time to have avoided the collision, after plaintiff came into a position of imminent peril. Defendant's learned counsel urge in argument that according to plaintiff's own version of the accident, he did not come into a position of imminent peril until he applied the brakes and stopped the automobile, and that thereafter it was impossible for defendant to have avoided the collision by either stopping the truck or sounding a warning. In this, however, we think counsel are proceeding upon a false premise. There is no question that under the law plaintiff was entitled to the right of way when he arrived at the intersection. The driver of the truck knew this. Plaintiff being entitled to the right of way, it was natural that he should take the right of way and proceed across the intersection. The driver of the truck knew this. So, too, plaintiff being entitled to the right of way, it was natural for him to assume that the driver of the truck would yield, and not undertake to usurp, the right of way. The driver of the truck knew this. Nevertheless, he undertook to usurp the right of way, at a speed of from twenty-five to thirty miles an hour, without sounding

any warning, so that plaintiff was unaware of his peril until he discovered the truck at the northwest corner of the intersection, too late to extricate himself. Upon making this discovery plaintiff naturally undertook to stop his automobile to avoid a collision. However, instead of taking the right of way as appearances showed he intended to do, the driver of the truck, for some reason, probably because he decided to yield the right of way to plaintiff at the instant plaintiff decided to yield the right of way to him, ran the truck directly upon the automobile. He must have known that just this or some such perilous situation of confusion, would result from his reckless attempt to usurp the right of way to which plaintiff was entitled. In view of the circumstances detailed, we think the plaintiff was, within the contemplation of the humanitarian rule, in imminent peril of injury from the oncoming truck, practically from the time he entered the intersection, and the driver of the truck must, of course, be charged with knowledge of such peril, since it was of his own creation.

"We judicially know, particularly in view of the testimony of the driver of the truck that the brakes were in good condition and that traveling at a speed of fifteen miles per hour the truck could have been stopped in ten feet, that traveling at a speed of twenty-five to thirty miles per hour it could have been stopped in a much less distance than that available as shown by the evidence. [Chawkley v. Wabash Railroad Co., 317 Mo. 782, 1. c. 797, 297 S. W. 20, 1. c. 24; Spoeneman v. Uhri, 332 Mo. 821, 60 S. W. (2d) 9, 1. c. 12.]

"It is true, as counsel suggest, that plaintiff was at all times conscious of the approach of the truck, but the evidence shows he was not conscious of the danger to which it was subjecting him. His knowledge of the approach of the truck did not relieve the driver of the duty to warn him of his peril, of which he was oblivious. [Jordan v. St. Joseph Railway, Light, Heat & Power Co. (Mo.), 73 S. W. (2d) 205, 1. c. 208; Lavine v. United Railways Co. (Mo. App.), 217 S. W. 574, 1. c. 576; Woodis v. United Railways Co. (Mo. App.), 203 S. W. 489; King v. Kansas City Railways Co. (Mo. App.), 204 S. W. 1129; Hart v. Weber (Mo.), 53 S. W. (2d) 914.]"

(Respondents here quote from Woodis v. United Railways Company and Lavine v. United Railways Company, cited in the opinion.)

"The circumstances surrounding plaintiff in the instant case as he was attempting to cross the intersection were peculiarly designed to impress him with a sense of security, and to prevent him from realizing the danger threatening him. The fact that he was entitled to the right of way, the distance that the truck was away from him, and his inability to determine the speed of the truck, when he entered the intersection, and the fact that the truck was at that time on the south side of the street, all conspired to assure him of his safety. The natural result was that he did not realize his danger until he

saw that the driver had swung the truck to the north side of the street in the execution of his purpose to usurp the right of way. Can it be said as a matter of law that under these circumstances a timely warning would not have awakened him to his peril, so as to have enabled him to avoid the collision? We think not. On the contrary, we think there was room for a fair inference that if a timely warning had been given he could and would have avoided the collision either by stopping his automobile sooner than he did or by accelerating its speed.''

██ In proceedings of this character we are concerned only with the question of conflict between the opinion of the Court of Appeals and prior decisions of this court, nor is it our province to determine whether or not the Court of Appeals has erred in its application of rules of law to the facts stated in its opinion. [See State ex rel. Hauck Bakery Co. v. Haid et al., 333 Mo. 76, 62 S. W. (2d) 400, and cases cited.] ██ In this case relator contends that respondents, judges of the Court of Appeals, contravened prior decisions of this court in two major respects, viz.—first, in their conclusion that Crane was in imminent peril within the contemplation of the Missouri ''humanitarian'' rule practically from the time he entered the intersection and, second, that there was a jury issue on the question of the truck driver's negligence in failing to give a warning signal after he discovered, or should have discovered, Crane's peril. In considering these contentions it must be kept in mind that contributory negligence on the part of the injured party is no defense where, as here, the case is submitted solely on the theory of negligence under said ''humanitarian'' doctrine, nor can primary or antecedent negligence of the defendant—negligence preceding the arising of the situation of imminent peril—be considered.

██ Relator contends that Crane was not in imminent peril until he applied his brakes and stopped in the pathway of the truck, thus creating the peril, and that in holding that he was in such peril practically from the time he entered the intersection respondents' opinion conflicts with numerous decisions of this court, citing: Elkin v. St. Louis Pub. Serv. Co., 335 Mo. 951, 74 S. W. (2d) 600; Ziegelmeier v. East St. Louis & Sub. Ry. Co., 330 Mo. 1013, 51 S. W. (2d) 1027; Lamoreux v. St. L.-S. F. Ry. Co., 337 Mo. 1028, 87 S. W. (2d) 640; Phillips v. St. L.-S. F. Ry. Co., 337 Mo. 1068, 87 S. W. (2d) 1035; Phillips v. Henson, 326 Mo. 282, 30 S. W. (2d) 1065; Roberts v. Consolidated Pav. & Mat. Co., 335 Mo. 6, 70 S. W. (2d) 543; Lackey v. United Rys. Co., 288 Mo. 120, 231 S. W. 956; Pope v. Wab. Ry. Co., 242 Mo. 232, 146 S. W. 790; Guyer v. Mo. Pac. Railroad Co., 174 Mo. 344, 73 S. W. 584. Relator further contends that there was no evidence as to the distance in which the truck, going twenty-five or thirty miles an hour, could have been stopped

after Crane thus created the peril by stopping in front of it and that in holding relator ·liable under the humanitarian rule as for failure of the truck driver to stop after the peril arose, the opinion contravenes several of the above cases and also Goodson v. Schwandt, 318 Mo. 666, 300 S. W. 795; Beal v.' St. L.-S. F. Ry. Co. (Mo.), 256 S. W. 733; State ex rel. St. L.-S. F. Ry. v. Reynolds, 289 Mo. 479, 233 S. W. 219; Markowitz v. Met. St. Ry. Co., 186 Mo. 350, 85 S. W. 351; Schmidt v. Mo. Pac. Ry. Co., 191 Mo. 215, 90 S. W. 136.

We shall not undertake to review all of the cases with which respondents' opinion is said to conflict. Most of them deal with situations where injury or death was inflicted by railroad trains or street cars, which operate on a fixed track and where, therefore, the danger zone was narrowed. In several, also, the court emphasizes the fact that the operator of a train or street car, seeing a person approaching the track at a rate of speed that permits of his stopping quickly and not apparently oblivious of the approach of such train or car, has a right to assume that such person will stop in a place of safety unless there is something in such person's conduct to indicate that he does not intend to do so. Illustrative of this class of cases is Elkin v. St. L. Pub. Serv. Co., supra. In that case the plaintiff, in a truck, drove upon the defendant's street car track in front of a street car and was injured. He approached the track slowly and could have stopped at any time within two feet. The court said that the danger zone must be determined by the facts of each particular case, and in holding that no case was made under the humanitarian rule said, 335 Mo. 1. c. 957:

"Considering the slow rate of speed at which the truck was traveling, and the short distance in which it could have been stopped, and assuming that the motorman saw and observed plaintiff at all times after he passed the hotel building where he could be seen, there being nothing in the conduct of plaintiff, or any fact or circumstance in the case to indicate to the motorman on the street car that plaintiff was oblivious of his danger, and that he intended to drive his truck upon the track in front of the approaching street car, the motorman had a right to assume that he would stop the truck before entering the danger zone, which, under the facts shown, was within a few feet of the track."

The court further said that since the motorman had a right to assume that the plaintiff would stop before going upon the track he was under no duty to slacken speed or sound a warning until it was or should have been apparent to him that the plaintiff did not intend to stop.

It is apparent that the Elkin case and cases of that type do not present factual situations similar to that in the instant case. Of the many decisions with which relator says respondents' opinion con-

flicts Phillips v. Henson, supra, appears to us to bear the closest resemblance in its facts to the case before us. In that case the plaintiff, Phillips, was injured in a collision between his motorcycle and the defendant's truck at the intersection of Easton Avenue, an east and west street, and Kienlen Avenue, extending northward from Easton, in the city of Wellston. Phillips was going west, in the north half of Easton Avenue, the defendant east in the south half thereof as they both approached the intersection at about the same time. The defendant truck driver intended to turn north—to his left—into Kienlen Avenue but gave no signal of such intention prior to making the turn. Phillips saw the truck before either party reached the intersection but did not know of the defendant's intention to turn to the north across his line of travel. The defendant started to turn the truck when he was twenty-five feet west of the intersection, at which time the plaintiff was ten feet east of the intersection and showing no indications of intending to stop. The defendant could have stopped or slackened speed so as to have avoided striking the plaintiff after he, defendant, started to turn. The court held that the defendant's failure to give prior warning of his *intention* to turn to his left across the plaintiff's path, while it might have been primary or antecedent negligence, could not be taken into account as negligence under the humanitarian rule, because the plaintiff was not in peril until the truck turned. But the court said that while the defendant's failure to give timely warning of his intention to turn was not negligence under the humanitarian doctrine it was a circumstance tending to show why the plaintiff might have assumed the truck would not turn and that therefore he could cross the intersection safely. It was held that under the circumstances of that case, which are more fully detailed in the opinion than we have attempted to do here, there was a case made for the jury under the humanitarian rule as for failure of the defendant to stop or slacken speed or give a warning which might have enabled the plaintiff to save himself after the truck turned, thus creating the imminent peril, and before the collision.

In the instant case, unlike the situation presented in the Elkin case and similar cases, the truck driver had no right to assume that Crane would stop before crossing the south half of Thomas Street, in which the truck originally was traveling, and where it belonged. Crane's conduct and movements clearly indicated his intention to proceed across the intersection, which intention must have been apparent to the truck driver. There was nothing to prevent his seeing the automobile when it got within six or eight feet of the south side of the intersection and as it then proceeded northward into the intersection, with the obvious purpose on the part of its driver to continue across. It was the truck driver's duty to be on the lookout for cars

on Garrison Avenue approaching the intersection—Mayfield v. K. C. Southern Ry. Co., 337 Mo. 79, 92, 85 S. W. (2d) 116, 123-4—and it must be held that he saw what he could have seen if he was looking, Phillips v. Henson, 326 Mo. 1. c. 290, 30 S. W. (2d) 1. c. 1067 (6-7). Crane said that when he first could see the truck he was within six or eight feet of the south line of the intersection and had reduced his speed to six or eight miles an hour. The truck was then 130 or 140 feet west of him. He could not then estimate its speed. He proceeded northward, gradually accelerating his speed. He said that when he again saw the truck, that is when he again saw it after having first seen it when he was six or eight feet south of the intersection, it was at the *northwest* corner of the intersection, just coming up to the sidewalk line on the west side of Garrison Avenue, and about thirty feet from him. Then for the first time, apparently, he realized its speed, which he estimated was then twenty-five or thirty miles an hour. Assuming, as it must be assumed for the purpose of determining the question of submissibility of the case, that Crane's testimony is true, it follows that between the time when he first saw the truck and the time when he again saw it at or near the northwest corner of the intersection the truck had swerved from the south side of Thomas Street, where it belonged, to the north side thereof, with the intention on the part of its driver of passing in front of Crane's automobile. Why, unless there was something in the then proximity of the two vehicles, the then rate of speed of the truck and the existing circumstances, that caused the truck driver to think that if he proceeded with undiminished speed on his proper side of Thomas Street —the south side—a collision was imminent? We think such inference may reasonably be drawn from the act of the truck driver in thus swerving to the north side of the street and, of course, in determining the question of submissibility, a plaintiff is entitled to the benefit of such favorable inferences as may reasonably be drawn from proved facts. Such danger was not removed nor, apparently, diminished, perhaps rather increased, by the action of the truck driver in thus swerving to the north and continuing his eastward progress, with the purpose of passing in front of Crane, who was proceeding northward across the intersection with the obvious intent of going on. It is argued that if, instead of stopping, Crane had gone on, continuing to accelerate his speed as he had done while crossing the south half of the intersection, he would have passed the line of travel of the approaching truck in safety. It may be figured out mathematically that possibly he might have done so. But it must be remembered that when he discovered the truck thirty feet from him, coming fast and showing no indication of stopping, he was confronted with an emergency in which he had to act instantly and the truck driver could hardly expect of him absolute accuracy of

judgment. It is also argued that Crane was not in peril when he entered the intersection because he could have stopped "almost instantly." Apropos of these contentions, especially the latter, we quote from Phillips v. Henson, 326 Mo. l. c. 292, 30 S. W. (2d) l. c. 1069 (10):

"The evidence tends to show that plaintiff was in peril as he approached the intersection. His peril arose as soon as it became apparent from his conduct that he intended to cross the intersection without stopping. [Burke v. Pappas, 293 S. W. 145, 316 Mo. 1235.] In this connection, defendant contends that plaintiff was never in a position of peril because his own evidence showed that he could have stopped his motorcycle before reaching the point of collision, after he discovered the truck had turned to the left. Such evidence would convict him of contributory negligence, but contributory negligence is not a defense to a cause under the humanitarian rule."

Under the facts as stated in respondents' opinion we cannot say that said opinion contravenes any rule of law or any conclusion announced by this court on a similar state of facts in holding that Crane was in imminent peril "practically from the time he entered the intersection." ▉ Neither can it be said that respondents contravened our prior decisions in holding that under the circumstances there was room for a fair inference that if a timely warning had been given Crane might have avoided the collision and injury. Relator says that respondents' opinion, in holding that there was a submissible issue on the question of failure to warn, contravenes our prior decisions in Pentecost v. Terminal Railroad Co., 334 Mo. 572, 66 S. W. (2d) 533; Phillips v. St. L.-S. F. Ry. Co., supra; State ex rel. Weddle v. Trimble, 331 Mo. 1, 52 S. W. (2d) 864; Womack v. Mo. Pac. Railroad Co., 337 Mo. 1160, 88 S. W. (2d) 368. Relator's contention is founded upon the proposition that Crane was not in peril until he applied his brakes and stopped, as relator contends, in the then pathway of the truck at about the middle or just north of the middle of Thomas Street, after which time a warning could have been of no avail because Crane then was, or became, aware of his perilous situation. But respondents held that the jury could legitimately have found that, in the circumstances shown, Crane was in imminent peril "practically" from the time he entered the intersection. We have said above that such conclusion does not contravene prior decisions of this court on similar facts. On this question of warning it must be kept in mind that Crane, when he first saw the truck 130 or 140 feet from him, approaching the intersection at a speed which he did not then appreciate, knowing that he had the right of way and evidently believing that he could safely proceed, started across the intersection, accelerating his speed and obviously intending to go on, all of which must be held to have been apparent

to the truck driver. Even if it could be said that Crane was negligent in thus going forward, such negligence, if any, on his part is no defense under the humanitarian doctrine. [See Allen v. Kessler (Mo.), 64 S. W. (2d) 630.]. Respondents' opinion recognizes the rule contended for by relator and which has been announced by this court that, as relator says—"obliviousness (of the peril on the part of the injured. party) is a necessary element to the making of a humanitarian case as for failure to warn," but says that while Crane was at all times conscious of the approach of the truck, "the evidence shows he was not conscious of the danger to which it was subjecting him." The truck driver, as we have stated, must be held to have observed Crane's movements and his obvious intention to proceed across the intersection. He should also have taken note of his own speed, his line of travel and his ability to stop or check his speed and of Crane's apparent obliviousness of impending danger. [Allen v. Kessler, supra.] In respondents' holding that under the evidence there was room for an inference that a timely warning after the peril arose might have enabled Crane to avoid the collision we cannot say that their opinion contravenes prior decisions of this court on like or similar facts. [See Allen v. Kessler, supra; Phillips v. Henson, supra.]

■ Relator says that even if respondents were correct in holding that recovery could be had as for failure to warn, the instruction submitting that issue was erroneous for failure to require a finding of obliviousness. The instruction is not before us and we cannot assume that it did not properly submit the issue. Respondents did not pass upon that question nor, apparently, were they called upon to do so. They referred to the instruction as submitting that issue and said that the defendant (relator) assigned error for the giving of the instruction on the ground that there was no evidence that a warning could have been given in time to have avoided the collision after Crane came into a position of imminent peril. On certiorari we are concerned only with rulings actually made, either expressly or by necessary implication, by the Court of Appeals. [State ex rel. Met. Life Ins. Co. v. Daues et al. (Mo.), 297 S. W. 951, 953, (2-3).] In our opinion our writ of certiorari herein should be quashed. It is so ordered. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.