R. W. ZICKEFOOSE and HAZEL N. ZICKEFOOSE, Parents of LAVERNE ROY ZICKEFOOSE, a minor, v. GUY A. THOMPSON, Trustee of the Missouri Pacific Railroad Company, a Corporation, Appellant.—148 S. W. (2d) 784.

Division Two, March 12, 1941.

580

*Thomas J. Cole* and *Spradling & Strom* for appellant.

*L. E. Tedrick* and *Phillips & Phillips* for respondents.

584

ELLISON, J.—This action was brought by the plaintiffs-respondents for the $10,000 penalty allowed by the wrongful death statute, Section 3262, Revised Statutes 1929, Mo. Stat. Ann., p. 3353, for the alleged negligent killing of their unmarried minor son, Laverne Roy Zickefoose, when the truck he was driving on Highway 67 near Neelyville, Missouri, ran into the side of a freight train operated by the Missouri Pacific Railroad Company, then and now in charge of the defendant-appellant Guy A. Thompson as trustee. The case was tried in the Circuit Court of Stoddard County on change of venue from Butler County and ten members of the jury returned a verdict for appellant. Respondents' motion for new trial complained: that the verdict was against the weight of the evidence; of the giving of five instructions for appellant; and of the erroneous admission and exclusion of evidence. The trial court sustained the motion without assigning any reasons for its ruling.

Appellant takes the burden in his brief of establishing that the motion for new trial was not sustainable on either of the first two grounds assigned therein. As to the first, he contends that no verdict for respondents could be allowed to stand because there was no substantial evidence to support such a verdict. If that be true, of course the verdict returned for appellant was not against the weight of the evidence. He also affirms that all the specified instructions given at his request were correct. The remaining assignment in the motion, that error was committed in the admission and exclusion of evidence, is indefinite and fails to point out the evidence complained of. Both parties ignore it in their briefs, and we do likewise.

The casualty occurred at a point on Highway 67 where the Doniphan branch of the Missouri Pacific crosses east and west over the highway practically at right angles. It was between 6 and 7 o'clock on the evening of February 10, 1937, after dark. The train was engaged in switching operations and had been standing still on the crossing, headed west, for several minutes awaiting the throwing of a switch; but had just begun to back east and had moved 6 to 20 feet when the collision occurred. The deceased drove his truck

into the side of a box car, knocking it off the railroad track. This car was the middle one of a string of five. Two cars and the engine were west of the highway, the car figuring in the collision was on the highway, and two cars were east of the highway.

The petition alleged a number of acts of primary negligence on the part of the train operatives, consisting of the failure to give the statutory crossing signals and violation of duties under the common law and certain rules of the railroad. In addition the humanitarian doctrine was pleaded: that the train operatives failed to give timely signals or other available warnings after they did or should have seen the deceased in a position of imminent peril and oblivious thereof as he approached the train, when by doing so they could have averted the collision. The answer contained a general denial, a plea of specific contributory negligence, and a plea that the death of deceased resulted from his own negligence. The assignments of primary negligence in the petition based on the common law and railroad rules were abandoned by sending the case to the jury on instructions submitting only negligence in failing to give the statutory crossing signals, and negligence under the humanitarian doctrine. [Yuronis v. Wells, 322 Mo. 1039, 1046, 17 S. W. (2d) 518, 521; Doyle v. Merchants Bridge Termn. Ry. Co., 326 Mo. 425, 435, 31 S. W. (2d) 1010, 1013; Linders v. Peoples Motorbus Company, 326 Mo. 695, 699, 700, 32 S. W. (2d) 580, 581; Crossno v. Terminal Rd. Co., 328 Mo. 826, 834, 41 S. W. (2d) 796, 800; State ex rel. Alton Rd. Co. v. Shain, 346 Mo. 681, 693, 143 S. W. (2d) 233, 239.]

Appellant's position on the facts is that respondents' decedent was guilty of contributory negligence as a matter of law. That, however, would not bar their recovery under the humanitarian doctrine upon a proper and substantial evidentiary showing. The only reference to that doctrine in appellant's brief is under Part II of his Argument, where attention is called to the fact that the five car train was moving very slowly across the highway with one car on it and two on each side of it. Then follows this sentence: "The deceased collided with the third box car, which was on the crossing, and there could have been no last chance or humanitarian doctrine in this case." We construe this language to mean the trainmen could have averted the collision after they saw or should have seen the deceased in a position of imminent peril (if they did) only by getting the train off the highway, which was impossible. But that theory does not consider whether the trainmen could have saved deceased by *warning* him.

Respondents' evidence of the failure of the enginemen to give the statutory crossing signals, by sounding the whistle or ringing the bell, was weak, but there was some substantial evidence in their behalf raising an issue of fact for the jury. We do not discuss this phase of the case because appellant puts it aside and confines his efforts to

establishing that the deceased was conclusively guilty of contributory negligence. On that issue we will have to state the facts more fully.

The deceased, a boy 17 years old, lived with his parents on a farm about 4 miles north of Poplar Bluff. Neelyville, where the collision occurred, was about 17 miles further south on Highway 67. He had been over that road once before, sometime. On the morning of the day of the collision, he drove down the same road and crossed the railroad track between 9 and 10 o'clock delivering some farm macinery for a merchant. It was on the return trip that he was killed. From this it would appear he had some acquaintance with the crossing but was not very familiar with it. On his return trip his truck was loaded with a tractor weighing about 3640 pounds. The vehicle he was driving was a Chevrolet heavy duty truck. The lights and brakes were "in extremely good condition." This testimony comes from the boy's father, R. W. Zickefoose. The lights would show an object a half-quarter of a mile (660 feet) ahead on the ordinary visible road. Highway #67 was black-top. Mr. Zickefoose did not know how far they would show on a black-top road, but there was testimony from two of respondents' witnesses that a black-top road does not reflect the light from automobile headlights as well as a surface less dark, and makes objects harder to see. Witness Biggs, who was traveling down the highway in his car about 300 or 400 feet behind deceased's truck, testified: "It was difficult to see after dark on that black-top road. You cannot see very far ahead of you."

There was no other evidence as to the conditions affecting visibility except that it was dark; that the truck lights were good; that the highway was substantially level; and concerning the color of the box cars. One witness for respondents said it was "just dusky dark . . . dusky dark, a little after dark;" and another without qualification that "it was dark." The locomotive fireman on the engine declared it "was really good and dark;" and that he could see the headlights of approaching automobiles for $\frac{1}{8}$ to $\frac{1}{4}$ mile. A section laborer for the railroad who lived 200 feet north of the crossing testified he was in his dooryard and saw the train as it went over the crossing. Witness Biggs, mentioned in the last paragraph, said he was 300 or 400 feet from the train when the collision occurred, and that he had not seen or heard it up to that time, but did see the tail light of the deceased's truck, and also the lantern of a switchman at the "Y" switch 100 to 150 feet east of the highway crossing. The sun set at 5:32 P. M. on that day. The color of the box car struck by the truck was "supposed to be red, but they were dirty looking." Another witness merely said they "were red."

There was a railroad X warning sign on the west side of the highway north of the railroad tracks, but it was hidden from the view of motor vehicle drivers approaching from the south by the train extending across the road. The train conductor had got down on the highway with his lantern on the *north* side of the train to

warn vehicles· coming from that direction, but none of the train crew were on the south side. One brakeman, Davidson, said at the beginning of his testimony that he was *on the rear car* of the train when the collision occurred, riding it back toward a switch, whence it was to continue on another track to be coupled to the rest of the train. The cars were about 40 feet long so he was something like 100· feet from the middle of the car across the highway. Later, he stated he was *at the switch* about 100 feet east of the crossing. The engineer testified the train was waiting for that switch to be thrown. The other brakeman, Haefer, said he was about 150 feet east of the crossing walking toward the cars that were to be added to the train, for the purpose of making the coupling. The engine at the head of the train was about 150 feet west of the crossing. The engineer was in his seat on the north side of the engine, and the fireman on the south side.

. The highway was dry, and there was no evidence of any fog. The deceased approached and collided with the train at undiminished speed according to the fireman. ·He was the only member of the train crew who saw the truck and the collision. But he was inferentially corroborated by respondents' only eyewitness, Biggs, who was driving along about 300 to 400 feet behind the truck. He said he saw the truck (tail lamp) "suddenly stop," when it was about 300 feet ahead of him, and heard the collision. There was no testimony from this witness that he was overtaking the truck shortly before the collision as would have been true if it had slowed up substantially. Neither did he say. he heard any screeching of tires or saw any swaying of the truck tail light, as doubtless would· have occurred if there had been violent braking. ·

There was no evidence as to the distance in which the truck could have been stopped when traveling 20-25 miles per hour, either empty or with its load of 3600 pounds, but it is uncontroverted that the box car weighed 50,000 or 60,000 pounds, empty, and was knocked off of its supporting wheels and partially off the railroad track, in the collision. The truck was jammed against the box car; both were on fire from the gasoline tank on the truck; and the heavy tractor on the truck had crashed through the driver's cab, injuring the deceased so much that he died in an ambulance on the way to Poplar Bluff.

Does all this evidence show the deceased was guilty of contributory negligence as a matter of law? He was dutybound to look ahead because he was driving a motor vehicle on the public highway, and was required by Section 8383, Revised Statutes 1939, Mo. Stat. Ann., p. 5197, to exercise the highest degree of care. Appellant cites State ex rel. K. C. So. Ry. Co. v. Shain, 340 Mo. 1195, 1201(3), 105 S. W. (2d) 915, 918(6), and other decisions referred to therein, which hold. that when one is under duty to look his failure to see plainly

visible threatening objects in his course constitutes contributory negligence as a matter of law. But in that case the plaintiff's headlights would illuminate the road ahead 300 feet under ordinary conditions. He knew he was approaching a railroad crossing, and had brought his automobile practically to a stop within 12 feet of a freight car straddling the highway, and then started up again and collided violently with it. The highway was gravel and there was some whirling snow when the wind came in gusts, but the night was clear.

Another case relied on by appellant is Diamond v. Terminal Rd. Assn., 346 Mo. 333, 347-8, 141 S. W. (2d) 789, 796, where the general rule was conceded to be that a person who drives "into the side of a train standing or moving over a grade crossing at night cannot, in the absence of special circumstances rendering the crossing peculiarly hazardous," recover damages for his injuries; and that "ordinarily the presence of a train upon a crossing is adequate notice to travelers that the crossing is preempted and, consequently, no additional signs, signals or warnings are required." This decision further holds the burden is on the plaintiff to prove the special conditions requiring the defendant railroad to provide special protection for motorists at a highway crossing over the track.

The special conditions relied on by plaintiff in that case were, mainly, that street lights spaced along the highway made alternate illuminated and dark areas, causing the pupils of the eyes to dilate and contract, thereby interfering with vision; and that lights ahead created an illusion that the railroad crossing was clear. An expert for plaintiff testified that under these environmental conditions the automobile in which she was riding would be about 50 feet from a black coal car in the train before the driver could see it distinctly. The headlamps of the automobile cast their light 50-75 feet ahead, according to the testimony of the driver, but the plaintiff said she could see "a long ways" ahead. Division I held this evidence was insufficient to take the case out of the usual rule and reversed outright a judgment for plaintiff. Other cases cited by appellant are: Philadelphia & R. Ry. Co. v. Dillon (Del.), 114 Atl. 62; Allison v. C., M. & St. P. Ry. Co., 83 Wash. 591, 145 Pac. 608; Farmer v. N. Y., N. H. & H. Ry. Co., 217 Mass. 158, 104 N. E. 492; Smith v. So. Ry. Co., 53 Fed. (2d) 186; Tidwell v. Atlanta, B. & C. Railroad, 42 Ga. App. 744, 157 S. E. 535.

Respondents cite three cases of the type here under review. The first is Elliott v. Mo. Pac. Rd. Co., 227 Mo. App. 225, 52 S. W. (2d) 448, where the plaintiff collided with a train of dark-colored coal cars blocking a highway in Pleasant Hill on a misty, foggy night, while driving his automobile, as the petition alleged, in the exercise of due care. A demurrer to the petition (which *admitted* these pleaded facts) was sustained by the trial court, and that ruling was reversed and the cause remanded on appeal. The factual situation was so

unlike that here that extended discussion of the decision is unnecessary. Another case is Carson v. Baldwin, 346 Mo. 984, 144 S. W. (2d) 134, 136(10), where a guest was riding in an automobile which collided with a flat car while it stood across the highway in Rich Hill. Only the narrow edge of the platform of the standing car was presented to the view of motorists. The crossing was unlighted and a boxcar on an adjoining track obscured the view. The street ran down hill, tilting the headlight beams below the car floor, and a light fog or mist reduced visibility. The record in the case shows several further facts not stated in the opinion: that the automobile was traveling 20 miles per hour; that it could have been stopped in about 50 feet; that the driver could see the coal car only 20 feet ahead although his lights were good. It was held the case was for the jury. This decision, also, is not similar enough in its facts to be in point here.

The third case, which respondents stress, is Poehler v. Lonsdale (St. L. Ct. App.), 129 S. W. (2d) 59. There the plaintiff motorist crashed into a black coal car standing across a highway in St. Louis, while running about 20 miles per hour in a dense fog which limited the range of his headlights to 20-25 feet on the pavement, though they were in good condition and would throw a direct beam on the ground 30-35 feet ahead in normal weather. The fog prevented the diffused light from illuminating the space higher up and hid the black coal car from view. Plaintiff was ignorant of the existence of the crossing, and never did see the coal car, being rendered unconscious in the collision.

The facts in this Poehler case, likewise, were dissimilar to those here: where the deceased had some acquaintance with the crossing; there was no fog; the freight train had some motion; and the lights on the truck ordinarily would enable the driver to see an object 660 feet ahead. Other differences will be noticed as we go on. We imagine, however, the case is cited because of the testimony of an expert set out in the opinion. He was a University Professor of physics and said about 50% of the lamp rays actually hitting a light concrete pavement would be absorbed and 50% reflected in all directions. But of the light striking a black coal car only about 10% would be reflected, because a black surface will absorb more light rays. In other words, the light reflected from a black surface is only about one-fifth of that reflected from a light concrete pavement.

If we stood ready to adopt the theory of the expert in the Poehler case (though it is not evidence here) it would come nearer than not to establishing that the deceased's truck lights disclosed the red box car 132 feet ahead on the black-top road (one-fifth the 660 feet distance the truck lights would show objects on an ordinary road.) But we do not say we can draw that inference as a matter of law. The statements made by the expert were not scientific facts of universal

knowledge; and there are too many variant factors. All we can get out of the Poehler case, as applied to the facts here, is that a black surface will reflect substantially less light than a light one; and we can take judicial notice of that. Besides, there is testimony in this record that a black surfaced highway would and did reduce visibility. Biggs, who was familiar with the crossing, declared he had not seen the train at the time of the collision when he was about 300 feet away. However, he could see the tail light of the truck for 300 to 400 feet, showing there was no fog or atmospheric interference. Another witness, Alex Turner, was walking north on the highway about 300 feet south of the crossing and did not see the train. But he was not looking for it or thinking about it.

Surveying the whole record, we think there is no substantial evidence in this case showing the number of feet the headlamps of deceased's truck, shining over the black surface of the highway, would disclose the red box car ahead, except, perhaps, that it was less than 300 feet. And there is no evidence as to the distance in which the deceased could have stopped the truck with its load of 3600 pounds, though the brakes were "in extremely good condition." But it is obvious that for some substantial distance along the level road he would have been able to see the box car that clear night with his powerful lights, without running into it headlong at undiminished speed. If he was able only to reduce the violence of the collision enough to save his life, and had done so, respondents' cause of action would not have arisen. There are decisions in which our Missouri courts have taken judicial notice of the distance in which a truck traveling at a given speed could be stopped.* But the character, condition and weight of the motor vehicle would make a difference, and it has been said we cannot accurately do more than set a maximum limit on the distance, Spoeneman v. Uhri, 332 Mo. 821, 829, 60 S. W. (2d) 9, 12.

We need not attempt to fix distances here. Under the rule in the Dimond case, supra, 346 Mo. 1. c. 347-8, 141 S. W. (2d) 789, 796, a person driving an automobile into the side of a standing or moving train at a grade crossing, even at night, cannot recover in the absence of special circumstances rendering the crossing peculiarily hazardous; and the burden is on him or his representatives to show those circumstances. That means he will be held guilty of contributory negligence in the absence of proof of that character, on the theory that if he had looked he could have seen the train and avoided

---

*10 feet at 15 miles per hour, and 20-30 miles per hour: Crane v. Sirkin & Needles Moving Co. (Mo. App.), 85 S. W. (2d) 911, 914(3), certiorari denied 340 Mo. 211, 218, 101 S. W. (2d) 50, 53; 20 feet at 10-15 miles per hour: Johnson v. Mo. Pac. Rd. Co. (Mo. App.), 72 S. W. (2d) 889, 895; Less than 100 feet at 25 miles per hour: Danklef v. Armbruster (Mo. App.), 91 S. W. (2d) 660, 663; 20-25 feet at 20 miles per hour: Chawkley v. Wabash Ry. Co., 317 Mo. 782, 797, 297 S. W. 20, 24.

the collision. There was no such proof here. A mere showing that the road was dark or black is not enough; the same would be true of many dirt roads or oil coated concrete pavements. In fact light concrete pavements are a development of the last twenty years or so.

■ Respondents invoke the presumption that deceased was exercising due care for his own safety at the time of his death. We concede it may freely be presumed that he did not intentionally drive headlong into the train for the purpose of killing or injuring himself. But the presumption that he exercised due care is another thing, and cannot stand as substantial evidence against the testimony of two eyewitnesses who *saw* what he did, one being the locomotive fireman, who testified for appellant and the other Judge Biggs, who testified for respondents. In State ex rel. Alton Rd. Co. v. Shain, supra, 346 Mo. l. c. 693, 143 S. W. (2d) l. c. 239(13), this court en banc recently held the presumption is indulged *only in the absence of evidence to the contrary*. It was unnecessary to decide in that case whether such rebutting evidence may be circumstantial, because there was an eyewitness for the plaintiff.

■ In the instant case, as just stated, there were two eyewitnesses. In the four decisions cited by respondents there were no eyewitnesses. Whiteaker v. Mo. Pac. Rd. Co. (Sp. Ct. App.), 15 S. W. (2d) 952, 953(1), held (we quote the pertinent syllabus) : "Where no one saw accident and no witness could relate how it occurred, it is presumed that deceased was in exercise of due care." And the opinion in Pulsifer v. City of Albany, 226 Mo. App. 529, 47 S. W. (2d) 233, 236(5), declared: "In the absence of the testimony of an eyewitness, the presumption would be that of due care and that the injury was the result of an accident." Jones v. St. L.-S. F. Ry. Co. (Mo. Div. 1), 220 S. W. 484, 485, holds only that "the deceased is presumed *prima facie* to have been using proper care." In Cech v. Mallinckrodt Chemical Co., 323 Mo. 601, 610, 20 S. W. (2d) 509, 511(3), there was no eyewitness, and while that fact is not specifically stated, the decision is doubtless mainly based on that ground. So these four cases are not in point, and we cannot sustain respondents' contentions, but must hold the deceased was guilty of contributory negligence as a matter of law.

But this still leaves for consideration the question whether there was substantial evidence which would have supported a verdict for respondents under the humanitarian doctrine. We have already shown that the engineer, the conductor and both brakemen did not see the deceased's truck approaching, and did not see the collision. The engineer was in his seat on the far side of the cab. The conductor was on the highway *north* of the train. Brakeman Haefer was about 150 feet away, walking northeast toward the cars to be coupled onto the train. None of them *could* see the deceased's truck approaching. Brakeman Davidson was at the end of the train about 100 feet east

of the crossing, engaged in the switching operation. He possibly could have seen the truck if he had looked in that direction, away from his work, but he did not. It was doubtless his lantern that witness Biggs saw.

Did these four men, or any of them, violate a humanitarian obligation to warn the deceased by audible or visible signal, such as whistling or waving a lantern, of the presence of the train on the crossing? The conductor apparently recognized some precautions were advisable because he was on the highway north of the train to stop motorists from that direction. Nevertheless he did not and could not see the truck approaching from the south, and did not know when the deceased came into imminent peril. We are convinced no liability under the humanitarian doctrine can be predicated on any dereliction of the conductor and brakeman or engineer, except as hereinafter stated. We are not dealing here with the *primary* negligence of these men, if any. The humanitarian doctrine exempts the plaintiff from penalty for his own contributory negligence and correspondingly exempts the defendant from liability for his antecedent or primary negligence. [Mayfield v. K. C. So. Ry. Co., 337 Mo. 79, 90, 85 S. W. (2d) 116, 122(6).]

As stated in the oft quoted case of State ex rel. Fleming v. Bland, 322 Mo. 565, 572, 15 S. W. (2d) 798, 801: "no duty whatever arises under that doctrine, unless and until a situation of peril comes into existence;" and "when such peril arises the doctrine seizes upon the situation as it then exists and requires the one operating the dangerous instrumentality to exercise ordinary care . . . to make timely discovery of the peril, if it was his duty to be on the lookout, and thereafter to avoid the infliction of the threatened injury, if he can do so with the means at hand and without jeopardizing the safety of himself and others." Without the slightest equivocation this decision rules that when and after the plaintiff's imminent peril arises there must be both a *duty* and a present *ability* on the part of the defendant to avert injury. If he cannot avoid the casualty except at the risk of injury to himself or others, for illustration, he is under no duty to save the plaintiff. If he is unable to do so, it makes no difference that his antecedent negligence deprived him of that power. [Spoeneman v. Uhri, supra, 332 Mo. l. c. 826(1, 2), 60 S. W. (2d) l. c. 11(2).] We do not mean that a defendant under a duty and in a position to watch will be excused merely because he refuses to turn his head and look; but if where he is when the peril begins and continues he *cannot* see, it makes no difference what prior negligence reduced him to that situation. It is a question of present ability.

Now in this case, since the engineer, conductor and brakeman Haefer were in places where they could not and did not know of deceased's peril, they had no present ability to save him. Brakeman

Davidson, also, did not see him, though he possibly could have, since witness Biggs some 300 feet back on the highway saw the brakeman's lantern. But whether Davidson could have seen the truck or not, and whether from his position 100 feet east of the highway the waving of his lantern would have been understood by deceased (Biggs thought nothing of it when he saw it) the fact remains that Davidson was under no duty to leave his position or disregard his duties and let the train run wild. We think he acted properly in keeping his eyes on his work.

With respect to the fireman, however, the situation is different. From his position in the engine cab 150 feet west of the crossing he *did* see the lights of the truck for a quarter of a mile, he said on direct examination, and for about one-eighth mile on cross-examination. He testified the truck was not going "extremely fast or anything like that" and did not diminish its speed before it struck the box car. Nevertheless he declared there was no indication whatever that deceased was going to run straight into the train. But when asked if he called the engineer's attention to the approaching truck, or said anything about it, he answered that he did not *until the engine started to back up*. Following that, according to his testimony, the the train moved 6 or 8 feet before the collision. The engineer estimated 8 or 10 feet. Brakeman Davidson said the train was barely moving and went not more than half a car length—which would be about 20 feet. The engineer declared he didn't "recall the fireman saying anything to me about the truck coming."

Since Brakeman Davidson testified the train was barely moving, we think it fair to assume it did not exceed the ordinary walking speed of the average man, which we have judicially noticed is two or three miles per hour, or 2.9 feet to 4.4 feet per second, McGowan v. Wells, 324 Mo. 652, 666, 24 S. W. (2d) 633, 639. It moved 6 to 20 feet before the collision, according to the evidence, which means the movements spanned several seconds—as many as seven seconds, giving the testimony the interpretation most favorable to respondents, as we must do. During that time the truck was bearing down at 20 to 25 miles per hour, or 29 to 37 feet per second. The conclusion mathematically follows that the truck must have been well over 100 feet from the track when the train movement began. It was at that time that the fireman told the engineer the truck was coming, showing he thought the situation was perilous. The engineer denied it. But whether the fireman did or did not warn the engineer, or if he did, whether he warned him adequately, the fact remains that no warning signal was given with the engine whistle. Several of the train crew testified the whistle was sounded three times when the train started to back up, but there was substantial evidence to the contrary. Taking the latter as true, and not meaning to rule as a matter of law that the deceased could have checked the speed of the truck enough to save

his life after the whistle was sounded, if it had been sounded, still we think it was a question about which average men might reasonably differ, and therefore for the jury.

This conclusion does not rest on piled inferences. Every step in the reasoning is based on evidence and facts judicially noticed, which are equivalent to evidence, Wolf v. Mallinckrodt Chemical Works, 336 Mo., 746, 762, 81 S. W. (2d) 323, 332(3), except the inference that the train was not moving faster than a man would ordinarily walk. And when the evidence of the fireman is considered as a whole the conclusion seems to be justified. He saw the truck approaching for at least one-eighth mile, or 660 feet, at undiminished speed; knew the dark night and black road reduced visibility; could not see who was driving the truck and observe his demeanor; and finally (he says) told the engineer that the truck was coming. In determining whether evidence is substantial or does not rise above the field of speculation and conjecture, the human element, the judgment and idiosyncrasies of the individual judicial mind, cannot be eliminated. But to us it seems the evidence made a case of prima facie negligence under the humanitarian doctrine on the part of the fireman, or the engineer if the fireman did adequately warn him.

Having reached this conclusion we must affirm the order of the trial judge sustaining the motion for new trial, on the theory that he meant to find the verdict for appellant was against the weight of the evidence. This would make it unnecessary to pass on the instructions, but in view of the possibility of another trial, we call attention briefly to certain errors in some of them.

Instructions 3, 4 and 5 authorize a verdict for appellant and yet ignore respondents' cause of action under the humanitarian doctrine. Instruction 4 told the jury if they believed the deceased by the exercise of the highest degree of care saw or could have seen the train on the crossing in time to avert the collision, but *carelessly and negligently* drove his truck into the side thereof and was killed, respondents could not recover and the verdict should be for appellant. Respondents assert the italicized words permitted a verdict against them on deceased's unpleaded, *general* contributory negligence. We think it would be better to recast the instruction.

Instruction No. 5 authorizing a verdict for appellant declared that it was the duty of the deceased while driving the truck on the highway "when approaching the railroad crossing in question, to realize and have in mind that he was approaching a place of danger; to be alert;" and to use his senses of sight and hearing. This was true only after he knew or should have known he had reached a point where such precautions were necessary. The word "approaching" is rather broad. [See Buehler v. Festus Mercantile Co., 343 Mo. 139, 159, 119 S. W. (2d) 961, 970(12).] Its use in this instance may seem to imply as a matter of law that the deceased should have

remembered where the railroad track was, from having crossed it that morning.

Instruction No. 8 said that if the act of the deceased in driving the truck against the train was the sole cause of his death, and that the same was not due to any negligence of the appellant, the verdict should be for defendant. Appellant says this was too general. On that point see: Dilallo v. Lynch, 340 Mo. 82, 89(3), 101 S. W. (2d) 7, 11(8); McGrath v. Meyers, 341 Mo. 412, 417(2), 107 S. W. (2d) 792, 794(4); Branson v. Abernathy Furniture Co., 344 Mo. 1171, 1187(7), 130 S. W. (2d) 562, 571(18).

By these comments we are not to be understood as approving the foregoing or the other instructions in other respects. For the several reasons noted, the order granting respondents a new trial is affirmed. *Leedy, J.,* concurs; *Tipton, P. J.,* concurs in result.