**Larry DURFEY, Appellant,**

v.

**MISSOURI PACIFIC RAILROAD COMPANY, Respondent.**

**No. WD 34205.**

Missouri Court of Appeals,
Western District.

April 16, 1985.

Larry E. Scott, Brown, Douglas & Brown, St. Joseph, for appellant.

Charles S. Wilcox, Wilcox, Houts & Douglass, St. Joseph, for respondent.

Before TURNAGE, C.J., and KENNEDY, and SWOFFORD, JJ.

SWOFFORD, Judge.

This case had its origin as a result of a collision of a tractor-trailer truck owned and being operated by Larry Durfey, appellant (hereinafter referred to as plaintiff), in an eastbound direction on a gravel street commonly known as Florence Road in St. Joseph, Missouri, and a switch engine owned and operated by the defendant northbound on switch tracks. Florence Road crosses the switch tracks at approximately right angles. This collision occurred on September 16, 1980, in an industrial area largely devoted to grain elevators and allied activities.

The plaintiff filed an action for damages based upon the cost of repairs to his trucking equipment, the rental cost for substitute equipment and resulting loss of hauling profits. No personal injuries are involved.

This action was filed in the Associate Circuit Court of Buchanan County by petition in two counts. Count I charged defendant with specific negligence in violation of both the terms of Missouri's statutes and ordinances of the city of St. Joseph governing use of unmarked public railroad crossings. Count II charged the defendant under Missouri's humanitarian negligence doctrine.

The case was tried before an associate circuit judge and resulted in a judgment in favor of the plaintiff and against the defendant in the amount of $4,318.35. Thereupon, the defendant filed an application for a trial de novo in the circuit court, §§ 512.180, 512.190 and 512.310, RSMo 1978, effective January 2, 1979.

The plaintiff in that court filed his first amended petition abandoning all allegations of specific negligence and choosing to rely solely upon humanitarian negligence charged in Count II upon which the case was submitted. The trial was court-tried without a jury on June 8, 1982, and judgment was entered in favor of the defendant on June 24, 1982, and this appeal followed.

Neither party made request for findings of fact or conclusions of law, Rule 73.01(a). The trial court, however, made the findings, a mixture of law and facts, which may be thus summarized:

1. The plaintiff abandoned any claim of primary negligence and submitted his case solely on humanitarian negligence.

2. At all times the switch engine was approaching the crossing, the whistle, horn and bell were being sounded and that it approached at 3–4 miles per hour while the plaintiff's truck equipment approached at 3–5 miles per hour.

3. The humanitarian negligence doctrine does not come into play until plaintiff has come into a position of imminent peril and it is the then existing factual situation which must be considered and neither prior nor antecedent negligence of either party may be considered.

4. No crewman on defendant's engine was in a position where he saw or could have seen plaintiff's truck until it was upon the crossing and in a position of imminent peril and the engineer could not then with the means at hand have avoided the collision by slowing or stopping.

5. Even assuming defendant had a crew member on the left or west side of the engine, there was no evidence that such crewman after seeing plaintiff in a position of imminent peril could have then warned the engineer in time for the engineer thereafter to have stopped or slowed the engine and avoided the collision.

Since the plaintiff in this case elected to submit his case solely on the humanitarian doctrine of negligence, a judicially declared rule of law in Missouri, one of the primary legal considerations on this appeal by this court is what effect the recent decision in

*Gustafson v. Benda,* 661 S.W.2d 11 (Mo. banc 1983), decided on November 22, 1983, as modified on the court's own motion on December 20, 1983, had, if any, upon the decision in this appeal. The bench, bar and many sectors of business and industry are acutely aware of the ruling in *Gustafson.* It is, indeed, a decision with great impact and far-reaching implications in Missouri. By adopting the doctrine of comparative fault in tort cases the Supreme Court, as stated by Billings, J., in his concurring opinion, at 1. c. 28:

> "Historically, contributory negligence, last clear chance, and humanitarian negligence, were born by judicial decisions. *By judicial decision we bury them."* (emphasis supplied)

The court after declaring the demise of doctrines of contributory negligence, last clear chance and humanitarian negligence, stated at 1.c. 15:

> "All that remains is for us to find the simplest and most clear, concise, and direct method for adopting a comprehensive system of comparative fault for the trial of tort cases and a procedure for accomplishing the transition to comparative fault.... Except for the instant case and interim cases where the parties can mutually agree, comparative fault *shall apply only in cases in which the trial begins* after the date of the publication of this opinion in the advance sheets of the Southwestern Reporter. Insofar as possible this and future cases shall apply the doctrine of pure comparative fault in accordance with the Uniform Comparative Fault Act ..." (emphasis supplied)

The collision involved in this case, the first trial in the Associate Circuit Court, the de novo trial in the Circuit Court, the judgment and the resulting appeal to this court all transpired before the decision in *Gustafson,* so the old rules and decisions dealing with humanitarian negligence will be applied as determinative of this appeal.

This long-standing doctrine was based upon five (5) basic and fundamental requirements of fact, all of which were necessary to be shown before the doctrine became applicable, as stated in the much cited case of *Banks v. Morris and Co.,* 302 Mo. 254, 267, 257 S.W. 482, 484–85[2] (banc 1924), wherein the court defines the essential elements in the following language:

> "(1) Plaintiff was in a position of peril;
>
> (2) defendant had notice thereof (*if it was the duty of defendant to have been on the lookout, constructive notice suffices* ); (emphasis added)
>
> (3) defendant after receiving such notice had the present ability, with the means at hand, to have averted the impending injury without injury to himself or others;
>
> (4) he failed to exercise ordinary care to avert such impending injury; and
>
> (5) by reason thereof plaintiff was injured."

These principles of humanitarian negligence remained a fundamental and judicially declared part of the negligence law of Missouri until *Gustafson,* supra. Of course, much controversy arose in both trial and appellate courts revolving around the meaning and applicability of the principles declared in *Banks v. Morris & Co.,* within the factual context of each case. From these emerged judicial refinements of *Banks v. Morris & Co.,* which, in turn, became firmly fixed and binding upon future litigation. One such applicable rule was expressed in *Eddings v. Keller,* 400 S.W.2d 164, 168[3] (Mo.1966), as follows:

> "In a humanitarian case it is *only when a position of imminent peril has arisen* that the doctrine comes into play and seizes upon the then existing situation, in effect *'blotting out primary or antecedent negligence.' Downing v. Dixon,* Mo.App., 314 S.W.2d 927, 930 [ (1958) ] and imposes a duty *thereafter* to exercise the required degree of care to avoid the threatened injury." (emphasis the Court's)

See also *Carney v. Stuart,* 331 S.W.2d 558, 562[4] (Mo.1960); and *Hill v. Barton,* 579 S.W.2d 121, 130[21–25] (Mo.App.1979).

In *Yarrington v. Lininger*, 327 S.W.2d 104, 108 [3–5] (Mo.1959), this principle was stated, l.c. 108, as follows:

"Whatever transpires from the *standpoint of either plaintiff or defendant prior* to the time that plaintiff enters into a position of imminent peril *does not affect the rights of the parties thereafter.*" (emphasis supplied)

The authority of this court and the scope of its review of a judgment on a court-tried case under Rule 73 is well-defined and restricted. Some confusion and difference of opinion arose from the meaning of the original terms and subsequent amendments of Rule 73. However, most of these were put to rest by the decision in *Murphy v. Carron*, 536 S.W.2d 30, 32 [1, 3] (Mo. banc 1976), wherein the court said, l.c. 32:

"Accordingly, appellate 'review ... as in suits of an equitable nature,' as found in Rule 73.01, is construed to mean that the decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong."

The subsequent appellate cases in Missouri have strictly adhered to this rule in *Murphy v. Carron*. See *Plank v. Plank*, 670 S.W.2d 185, 189 [2, 3] (Mo.App.1984); *Busby v. Busby*, 669 S.W.2d 597, 599 [3] (Mo.App.1984); *Vanderson v. Vanderson*, 668 S.W.2d 167, 171 [6, 7] (Mo.App.1984); and Missouri Digest, Appeal and Error Keys 846(1), 1009(4), 1010.1(6) and 1012.-1(1).

■ Further, on an appeal from a court-tried case, "[d]ue regard shall be given to the opportunity of the trial court to have judged the credibility of witnesses." Rule 73.01. See also: *Plank v. Plank*, supra, at 189 [3]; *Sivils v. Sivils*, 659 S.W.2d 525, 528 [3] (Mo.App.1983); and *R.D.L. v.*

*J.G.S.*, 659 S.W.2d 324, 324 [1] (Mo.App. 1983).

■ Another firmly established judicial rule which must be considered on this appeal is that "substantial evidence" as used in *Murphy v. Carron*, supra, is evidence from which the trier of the facts reasonably could find the issues in harmony therewith. *Reproductive Health Services, Inc. v. Lee*, 660 S.W.2d 330, 335 [2] (Mo. App.1983).

■ The trial court is clothed with broad discretion in this type of trial and this court should not rule that such discretion was abused except when the court's ruling runs against the "logic of the circumstances" then before the court. In *State ex rel. Missouri Highway and Transportation Commission v. Kersey*, 663 S.W.2d 364, 368 [5] (Mo.App.1983), the court states, l.c. 368:

"If reasonable men can differ about the propriety of the action taken by the trial court, then the trial court did not abuse its discretion."

In *Plank v. Plank*, supra, at 189 [3–6], citing *Ware v. Ware*, 647 S.W.2d 582, 583–84 [1, 2] (Mo.App.1983), the court held that where there was a conflict in the evidence in a court-tried case the court was empowered to accept or reject all, part or none of the testimony and stated, at 189:

"Further, we must accept as true the evidence and permissible inferences therefrom favorable to the prevailing party and disregard the contradictory evidence."

With the above principles of the review powers and obligations of this court in this type of appeal in mind, it is necessary to summarize the evidence in the trial as it bears upon the doctrine of humanitarian negligence.

*Larry Durfey*, plaintiff, a resident of Farragut, Iowa, was the owner-operator of a tractor-trailer trucking rig engaged in hauling agricultural and milling products in and outside Iowa to mills and business projects, including some located in St. Jo-

seph, Missouri, in the area where the collision occurred. He operated this business as an independent contractor. His rig measured 60 feet in overall length and was the equipment involved here on September 16, 1980, at approximately 9:45 a.m. Prior to the collision, he had delivered a load of grain to a mill south of Florence Road, had proceeded north toward Florence on a driveway running parallel and west of the switch tracks on which the defendant's engine also was operated north toward Florence. The plaintiff, when reaching Florence, turned east on Florence and because of the exceedingly rough surface of the first (western) switch tracks he was watching through his rearview mirrors to make sure that his trailer followed safely and without complications. He could give no estimate as to the distance separating the west and east track on which the collision occurred.

After he had passed the first switch track and was headed east toward the point of collision on the second (east) track, he did not see the defendant's switch engine until his front bumper and "perhaps maybe a foot of the nose would have been on the track." His speed was less than 5 mph (estimates 2–3 mph) and he was in first gear. He braked his truck and then decided to "hit it" and "accelerated as hard as he could to get across." The trailer was hit on the right side at about the center (Plaintiff's Exhibit No. 7).

He testified that the crossing was unmarked, there was no flagman, and he heard no whistle or bell. He was familiar with the crossing and had been over it many times.

*Gary Hanson* testified on behalf of the plaintiff. On the day of the collision he was an employee of the Pillsbury Company in the scale house, Plant B, located about 100 feet north of the Florence Road crossing. He heard no whistle or bell.

*James B. McAsey*, the defendant's engineer, was called by the plaintiff as an adverse witness. He had 25 years experience as an engineer and at the time of the collision was servicing the tracks in question. At the time, this job was being done with a four-man crew, engineer and three switchmen. At the time of the occurrence, he was operating the engine, which had no cars attached, in a northerly direction approaching Florence crossing. His engineer's station was on the right side (east) and at the rear of the engine. From this position he had no visibility to the west for eastbound traffic on Florence because of the engine bulk ahead of his position. The engine had an overall length of 53–55 feet. As the engine approached Florence, one of the switchmen was on the steps toward the rear on the east side, from which position he had no visibility to the west; the other two switchmen were following the engine on foot some distance to the south.

He testified that as he approached the crossing, he was sounding the whistle, the engine bell was ringing and the headlight was on. He approached at a speed of about 5 mph. His first sight of Durfey's eastbound truck was when the front end was passing "right by the front end" of the engine. He applied the engine brakes but could not avoid the collision by stopping or slowing the engine short of impact. At a speed of 3–5 mph with full application of the air, the engine would stop in about 8–10 feet.

The plaintiff then rested his case and the defendant offered the following testimony:

*Randy West* was a switchman employed by the defendant and assigned to the switching here involved. On September 16, 1980, just before the collision, he was riding on the engine and was standing on the right (east) rear of the engine at the steps. From this position, he could not see traffic on Florence Road coming from the west. The speed of the engine was about 3–4 mph, the engine bell was ringing, the whistle was being blown, and the headlight was on. He first knew that there was trouble when he saw the cab of the truck come across in front of the engine. At that time, the engineer applied the emergency brake.

*Steven Palmer* was a switchman employed by defendant and working on the operations here involved on September 16,

1980. At the time of the collision on Florence, he was walking on the track following the engine on the west side about ten car lengths, (about 500 feet to the south). He heard the engine's horn blowing as the engine approached Florence.

*Richard Thompson* was the foreman of the switch crew on September 16, 1980, and was on the track on foot, 5–7 car lengths (250–350 feet) south of the crossing, looking to the south so that he did not see the collision. He heard the engine's bell and whistle as the engine proceeded north.

While this evidentiary record is somewhat sparse and, in hindsight, several questions may arise, these facts bearing on the issues for decision emerge as established beyond dispute under *Banks v. Morris and Co.*, supra; they are that when the plaintiff's truck reached the track or so close thereto as to be unable to stop before reaching the track on which the engine was moving, he and his equipment were in a position of peril. Further, it is beyond dispute that the plaintiff's equipment sustained damage as a result of the collision. Also, the facts are undisputed that neither the engineer from his position at the rear of the engine on the east side nor the switchman riding the engine on the steps on the east side could see the truck until the front end thereof passed in front of the engine and came into view on the east side. Also, the evidence is undisputed that the moment the engineer saw the plaintiff's truck, he applied the brakes but could not thereby avoid the collision.

▉ The evidence was conflicting as to whether or not the engineer was sounding warnings as he approached Florence Road by whistle and bell. The trial court found that he was using those appliances to give such warnings and this court holds that such finding of fact was supported by substantial evidence, and this court will not disturb such finding.

▉ Appellant argues in his brief that the engineer had "appliances" that he did not use to avert the collision in that no member of the crew was placed in a position to observe eastbound vehicles on Florence Road so that he could pass verbal warnings to the engineer, and further, that no flagman was placed at the crossing. If by any theory of humanitarian negligence a switchman can be placed in the category of "appliance" or "means", research has not disclosed such authority. In any event, if such failure on the part of the defendant or its crew was in fact "negligent", it would certainly be primary or antecedent to the plaintiff's peril under the authorities cited.

In this connection, this case comes within the principle stated in *Zickefoose v. Thompson*, 347 Mo. 579, 148 S.W.2d 784 (1941). The court stated 148 S.W.2d at 1.c. 791:

> "We do not mean that a defendant under a duty and in a position to watch will be excused merely because he refuses to turn his head and look; but *if where he is when the peril begins and continues he cannot see, it makes no difference what prior negligence reduced him to that situation.* It is a question of present ability." (emphasis supplied)

The trial court's judgment, the record on which it was based, and briefs of counsel have been carefully reviewed, and this court concludes that under Rule 73, *Murphy v. Carron, supra*, and authorities cited, supra, that the trial court did not err nor did it violate the proscriptions upon the scope of review herein.

The judgment is affirmed.

All concur.